1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8    Harold James, Peter Castillo, and Lee H.)    No. CV05-04106-PCT-NVW
     Manygoats,                              )
9                                            )    **ORDER**
                    Plaintiffs,              )
10                                           )
     vs.                                     )
11                                           )
     Burlington  Northern  Santa  Fe  Railway)
12   Company; John Does I-V, husbands and)
     wives; Black Partnerships I-V; and White)
13   Corporations I-V,                       )
                                             )
14                  Defendants.              )
     _____)
15                                           )
     Burlington  Northern  Santa  Fe  Railway)
16   Company, a Delaware Corporation,        )
                                             )
17                  Third Party Plaintiff,   )
                                             )
18       v.                                  )
                                             )
19   A-Ceco  Equipment  Company,  Inc.,  an)
     Arizona   corporation;   Zurich   North)
20   America   d/b/a   Steadfast   Insurance)
     Company, a Texas corporation; John Doe)
21   VI; Black & White Corporations VI-X,    )
                                             )
22                  Third Party Defendants.  )
                                             )
23   _____)

24          The court has before it Third Party Plaintiff Burlington Northern Santa Fe Railway

25   Company's ("BNSF's" or "Railroad's") Motion for Summary Judgment (doc. # 82), and

26   supporting Statement of Facts ("BSOF") (doc. # 83); Third Party Defendant A-Ceco

27   Equipment Company's ("A-Ceco's") Response (doc. # 108) and supporting Statement of

28   Facts ("ASOF") (doc. # 109); and the Reply (doc. # 119).

The  Motion will be denied because there is a disputed issue of material fact as to whether Arizona's anti-indemnity statute, A.R.S. § 32-1159, voids A-Ceco's promise to indemnify, and because BNSF's remaining grounds for summary judgment are without merit.

**I.     Background**

Assaying the evidence in the light most favorable to A-Ceco, and drawing all reasonable inferences in its favor, the admissible evidence shows the following.

**A.     The Underlying Negligence Action**

Burlington Northern Santa Fe Railway employees Harold James, Peter Castillo, and Lee H. Manygoats ("Plaintiffs") were injured while performing track maintenance near Flagstaff, Arizona on July 12, 2004.  (Doc. # 1.)  James, Castillo, and Manygoats were part of an approximately 30-member work crew assigned to replace the north and south rails of Main Track Two in the vicinity of Interstate-40.[1] (ASOF Ex. 7 at 13-15.)  In this section of the track, the railroad runs east to west and then curves sharply to the north as it passes under the interstate.  (*See id*. Ex. 12 at 6 (visual depiction of the work site).)

The A-Ceco Equipment Company supplied the BNSF work crew with a front end loader and a front end loader operator named David Robinson ("Robinson").  A-Ceco employee Robinson "[took] orders" from the Railroad on the date of the accident.  (*Id*. Ex. 6 at 14-15.)   A-Ceco  has provided the Railroad with heavy equipment, operational personnel, and other services under the Contract for Construction or Other Work ("the Work Agreement") since January 31, 1997.  (*Id*. Ex. 5 § 3 ("Scope of Work," where A-Ceco agreed, for adequate consideration, to provide and operate "miscellaneous equipment" for a range of BNSF construction and maintenance projects).)

---

[1] The work crew used a "P8-11" machine to take out the wooden railroad ties and replace them with concrete ties.  (ASOF Ex. 7 at 13.)  The crew also used a "Grove crane" to "thread" or guide the quarter-mile sections of replacement rail into position.  (*Id*. Ex. 7 at 15-16.)

BNSF Road Master Ted Kenner ("Kenner") supervised the replacement of Main Track Two on July 12, 2004. (*Id*. Ex. 7 at 12.) Kenner was assisted by BNSF Foremen Myron Dickerson ("Dickerson") and Jason Lacey ("Lacey"). (*Id*. Ex. 7 at 12.) Kenner communicated with Dickerson, Lacey, and the other BNSF employees via Nextel radio on channel 66. (*Id*. Ex. 7 at 20-21.) The Road Master gave orders to Robinson on channel 60 because the A-Ceco employee's radio was incapable of receiving transmissions on channel 66. (*Id*. Ex. 6 at 24-25.)

At the time of the accident, James, Castillo, and Manygoats were, among other things, manually removing specialized track anchors called "Pandrol Clips"[2] from the north rail of Main Track Two. (*Id*. Ex. 10 at 24-25.) While Plaintiffs labored in the space between the two parallel rails of the railroad track (the "gauge"), Robinson prepared to "pull" an approximately 1,600 foot replacement rail into position on the south side of Main Track Two. (*Id*. Ex. 6 at 21, 32-33; Ex. 10 at 44.) Robinson connected the quarter-mile section of rail to his front end loader, and then radioed Kenner on channel 60 to inform the Road Master that he was "[r]eady to pull" (*Id*. Ex. 6 at 28.) Kenner instructed Robinson to "[h]old on" until he could "clear men and equipment" from Main Track Two. (*Id*. Ex. 6 at 29.) Robinson was positioned on a sharp curve in the railroad track, so he was unable to look directly east toward the work site to independently confirm whether the track was clear of men and equipment. (*Id*. Ex. 6 at 32.)

Roadmaster Kenner told Foreman Dickerson, who was standing nearby, to send out a transmission on channel 66 instructing the crew members to move out of the way of the new rail. (*Id*. Ex. 7 at 18-19.) Dickerson called Plaintiff Harold James on the designated channel and told him to "get your guys in the clear." (*Id*. Ex. 7 at 19.) After several minutes, James radioed back, "We're in the clear. . . . You can pull." (*Id*. Ex. 7 at 25.) Dickerson told the Road Master that the track was clear, though he had visual evidence to the contrary. (*Id*. Ex. 7 at 26-27.) Kenner then called Robinson on channel

_____

[2] Pandrol Clips are used to fasten railroad rails to railroad ties.

60 to say, "Okay David.  Men and equipment are clear.  Let's pull the rail."  (*Id.* Ex. 6 at 29.)  Robinson confirmed, "Proceed to pull, I'm proceeding to pull," to which Kenner responded, "Right on."  (*Id.* Ex. 6 at 28-29.)  Although Robinson did not know it, James, Castillo, and Manygoats were still positioned inside the gauge of Main Track Two at this time.

Robinson used his front end loader to pull the 60,000 pound section of replacement rail approximately 15 to 25 feet to the west.  (*Id.* Ex. 6 at 29-30; doc. # 130 Ex. 2 at 50.) "When the order was given to pull the rail [Kenner intended] to . . . keep it outside the gauge of the rail on the south side."  (*Id.* Ex. 8 at 40.)   However, when Robinson pulled, the rail unexpectedly "jumped" from outside the south side of Main Track Two inside the gauge, striking James, Castillo, and Manygoats, and pinning them to the ground.  (*Id.* Ex. 6 at 33-35.)  Kenner radioed Robinson, "Stop.  We've got people under the rail."  (*Id.* Ex. 6 at 30.)  Robinson immediately ceased pulling, detached the rail puller from his front end loader, and drove east along the railroad bed toward the work site to rescue his colleagues.  (*Id.* Ex. 6 at 30.)  The BNSF employees sustained serious leg and foot injuries as a result of the accident.  (Doc. # 1 at 2.)

James, Castillo, and Manygoats filed suit against the Railroad under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60 ("FELA"), on December 14, 2005.  (Doc. # 1.)  Plaintiffs allege negligent failure to provide a safe working environment and they seek relief for a variety of damages.[3]  (*Id.*)  The Complaint does not allege negligence on the part of David Robinson or his employer, the A-Ceco Equipment Company.  Rather,

---

[3] Under FELA's main liability provision, "every common carrier by railroad . . . shall be liable in damages [to employees] . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier."  45 U.S.C. § 51; *Lewy v. Southern Pacific Transp. Co.*, 799 F.2d 1281, 1288 (9th Cir. 1986) (surveying legislative history of the FELA and noting its "broad intended scope" and "open-ended wording"); *Norfolk Southern Ry. v. Sorrell*, 127 S. Ct. 799, 166 L. Ed. 2d 638 (2007) ("FELA was . . . enacted to benefit railroad employees, as the express abrogation of such common-law defenses as assumption of risk, the contributory negligence bar, and the fellow servant rule make clear.")

1  Plaintiffs fault only the Railroad, which had the "right to control [Robinson's] work," for

2  negligently "instruct[ing] [Robinson] when to move the rail involved in this incident."

3  (*Id*. at 3.)  The court has jurisdiction over Plaintiffs' statutory cause of action pursuant to

4  45 U.S.C. § 56.

5  **B.     The Railroad's Motion for Summary Judgment**

6          BNSF filed a third-party action against A-Ceco on July 25, 2006.  (Doc. # 41.)

7  The Railroad's third-party claims against Zurich North America ("Zurich"), the

8  commercial general liability insurer designated by A-Ceco under the Work Agreement,

9  are discussed by separate Order.  Subject matter jurisdiction over the Railroad's third-

10 party claims is conferred by 28 U.S.C. § 1367(a).

11         On summary judgment, the Railroad argues that A-Ceco is required as a matter of

12 law to defend and indemnify BNSF in the underlying FELA action (Counts I, II, and V of

13 the Third Party Complaint), and that A-Ceco breached the Work Agreement by failing to

14 procure FELA insurance (Count III) in the required amount (Count IV).  (Doc. # 82 at 1-

15 2.)  BNSF does not move for summary judgment on its claims for common law indemnity

16 (Count VI) and contribution (Count VII).  (*Id*. at 1 n.1.)

17         A-Ceco rejoins that the Work Agreement does not obligate it to defend or

18 indemnify the Railroad because A-Ceco is not alleged to be responsible for Plaintiffs'

19 injuries, and the record does not show that Robinson was negligent in following BNSF's

20 order to pull the rail.  (Doc. # 108 at 1-2.)  Summary judgment on the indemnification and

21 defense issues is inappropriate, the Railroad avers, because the Railroad has not

22 established beyond dispute that A-Ceco's negligence contributed to Plaintiffs' loss.  (Doc.

23 # 133 at 6.)  A-Ceco also challenges BNSF's breach of contract claim, arguing that A-

24 Ceco was not required to purchase FELA liability insurance under the Work Agreement,

25 and that the commercial general liability coverage it did procure was otherwise sufficient.

26 (Doc. # 108 10-13.)

27         Before tackling these arguments, the court will pause to retrace the familiar

28 contours of Fed. R. Civ. P. 56.

## II.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must evaluate a party's motion for summary judgment construing the alleged facts with all reasonable inferences favoring the nonmoving party. *See Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory and speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). In the precincts patrolled by Rule 56, "Proof based on arrant speculation, optimistic surmise or farfetched inference will not suffice." *Kelly v. United States*, 924 F.2d 355, 357-58 (1st Cir. 1991).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1985). Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. *See also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994). Summary judgment is not appropriate when the nonmoving party submits evidence from which a reasonable juror, drawing all inferences in favor of the

1   nonmoving party, could return a verdict in the nonmoving party's favor. *United States v.*

2   *Shumway*, 199 F.3d 1093, 1103-04 (9th Cir. 1999). Although the initial burden is on the

3   movant to show the absence of a genuine issue of material fact, this burden may be

4   discharged by indicating to the court that there is an absence of evidence to support the

5   nonmoving party's claims. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099,

6   1105-06 (9th Cir. 2000).

7   **III.    Legal Analysis**

8        **A.    Arizona Law Applies to the Railroad's Third-Party Claims**

9        The Federal Employers' Liability Act governs the relationship between the

10  Burlington Northern Santa Fe Railway Company and its employees James, Castillo, and

11  Manygoats. Because Plaintiffs' right of action is a creature of federal law, federal

12  decisional law controls regardless of the law of this forum. *Bailey v. Central Vermont*

13  *Ry.*, 319 U.S. 350, 352 (1943); *but see Norfolk Southern Ry.*, 127 S. Ct. at 805 ("Absent

14  express language to the contrary, the elements of a FELA claim are determined by

15  reference to the common law.") (citations and internal quotations omitted).

16       State law governs a FELA defendant's right to indemnity and contribution against

17  third parties, however. *Shields v. Consolidated Rail Corp.*, 810 F.2d 397 (3d Cir. 1987)

18  (third-party actions arising out of FELA claims governed by state law) (collecting cases).

19  In *Ellison v. Shell Oil Co.*, 882 F.2d 349, 352 (9th Cir. 1989), the court held that "FELA

20  does not bar railroads from seeking indemnity where state law permits and where another

21  party bears some legal responsibility." "FELA's purpose of providing recovery for

22  injured workers is not defeated," the court reasoned, "by permitting an employer to

23  recoup its losses in part or in full from a third party, when the circumstances and state law

24  permit." *Id.*

25       The choice-of-law clause negotiated by the parties to the Contract for Construction

26  or Other Work provides, "All questions arising under this Agreement shall be decided

27  according to the laws of the state where the work is to be performed." (ASOF Ex. 5 §

28  29.) The accident giving rise to the Railroad's disputed claims for defense, indemnity,

- 7 -

1   and breach of contract occurred in Arizona.   Therefore, the Railroad's third-party claims

2   against A-Ceco must be adjudicated under Arizona law.

3          **B.     A-Ceco's Contractual Duty to Defend and Indemnify**

4         The Work Agreement between A-Ceco and BNSF contains ten separate indemnity

5   clauses in which A-Ceco agreed to "hold the Railroad harmless"[4] for a range of claims

6   arising out the contractor's performance under the contract.  (ASOF Ex. 5 §§ 3(d)

7   (removal of A-Ceco employees from BNSF premises); 6 (acts or omissions of

8   subcontractors); 8 (damage to fiber optic cable systems); 14(b) (failure to comply with

9   environmental laws); 14(c) (violation of any other law, ordinance, order, or regulation);

10  15 (patent infringement); 16(b)-(c) (broad form general indemnity including FELA

11  claims); 17(a) (property damage to subcontractors); 19(b) (liens); 20(b) (violation of

12  pension, unemployment, and tax laws).)

13        The indemnity at issue in this case, which is found in Section 16, is much broader

14  than the other "hold harmless" clauses.   In fact, this clause purports to make A-Ceco

15  liable for all BNSF financial obligations, including FELA liabilities, "arising in any

16  manner" from A-Ceco's performance under the Work Agreement, regardless of which

17  party's negligence caused the liability.  The risk of loss is transferred to A-Ceco even

18  where the injury "was occasioned by" the Railroad without any contributory negligence

19  on the part of A-Ceco.   (*Id*. Ex. 5 § 16(b).

20        Section 16 of the Work Agreement provides, in relevant part:

21

22        [4] Under such "loss or damage" indemnity clauses, A-Ceco's duty to indemnify does

23  not attach until the Railroad has paid the obligation for which it was found liable. *INA Ins.
    Co. v. Valley Forge Ins. Co.*, 150 Ariz. 248, 253, 722 P.2d 975, 980 (Ct. App. 1986).

24  Because "[t]he right [to indemnity] exists when . . .  a sum is paid by [the indemnitee] for

25  which the indemnitor should make reimbursement," the "obligation [to indemnify] cannot
    be imposed solely by a third party's unproven allegations against the indemnity parties, but

26  requires factual determinations." *Id*. at 255, 722 P.2d at 982 (comparing the indemnitor's

27  duty to indemnify with the insurer's duty to defend, "which arises at the earliest stage of
    litigation and generally exists regardless of whether the insured is ultimately found liable").

28

Contractor [A-Ceco] shall indemnify and hold harmless Railroad for all judgments, awards, claims, demands, and expenses (including attorneys' fees), for injury or death to all persons, including Railroad's[,] arising in any manner from [A-Ceco's] . . . acts or omissions or failure to perform any obligation hereunder.  **THE LIABILITY ASSUMED BY [A-CECO] SHALL NOT BE AFFECTED BY THE FACT, IF IT IS A FACT, THAT THE DESTRUCTION, DAMAGE, DEATH, OR INJURY WAS OCCASIONED BY OR CONTRIBUTED TO BY THE NEGLIGENCE OF RAILROAD, ITS AGENTS, SERVANTS, EMPLOYEES, OR OTHERWISE, EXCEPT TO THE EXTENT THAT SUCH CLAIMS ARE PROXIMATELY CAUSED BY THE INTENTIONAL MISCONDUCT OR GROSS NEGLIGENCE OF RAILROAD.**

**THE INDEMNIFICATION OBLIGATION ASSUMED BY [A-CECO] SHALL INCLUDE ANY CLAIMS, SUITS OR JUDGMENTS BROUGHT AGAINST RAILROAD UNDER THE FEDERAL EMPLOYERS['] LIABILITY ACT, . . . WHENEVER SO CLAIMED.**

(*Id.* Ex. 5 § 16(b)-(c) (emphasis in original).)  This broad indemnification obligation is bulwarked by an additional A-Ceco covenant to "appear and defend any suits . . . brought against [BNSF] on any claim . . arising or growing out of or in any manner connected with any liability assumed by [A-Ceco] under this Agreement for which Railroad is liable or is alleged to be liable."  (*Id.*  Ex. 5 § 16(d).)

Plaintiffs' FELA claim falls within Section 16's indemnification provision because (1) the underlying negligence action "aris[es] out of an A-Ceco "act," namely A-Ceco employee David Robinson's pulling of the replacement rail on July 12, 2004; and (2) James, Castillo, and Manygoats have not alleged intentional misconduct or gross negligence on the part of the Railroad.  (Doc. # 1.)  If the indemnification provision applies as written, then A-Ceco's assumption of the Railroad's FELA liability is not affected by Plaintiffs' allegation that the Railroad is 100 percent and A-Ceco zero percent responsible for the track replacement accident.  (ASOF Ex. 5 § 16(b) (the liability assumed by [A-Ceco] shall not be affected by the fact . . . that the . . . injury was *occasioned by* . . . the negligence of Railroad) (emphasis added).)  Furthermore, the plain language of Section 16(d) obligates A-Ceco to defend the Railroad in the underlying action so as to prevent the assumed FELA liability from accruing in the first instance.  Whether Section 16 applies as written is the question to be decided here.

1           **C.**       **The Enforceability of the Contractual Indemnity Provision**

2                  **1.**       **Arizona Law**

3        The "[i]nterpretation of a contract is a question of law" for the court to decide.

4 *Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., L.L.C.*, 213 Ariz. 83, 86, 138 P.3d 1210,

5 1213 (Ct. App. 2006) (citation omitted).  Arizona law "permits a party to protect itself

6 contractually by shifting liability for its faults to another via the mechanism of

7 indemnity." *Id.* (citation omitted).  There are three types of indemnities: the "limited

8 form indemnity," the "intermediate form indemnity," and the "broad form indemnity."

9 Trisha Strode, *Comment: From the Bottom Of the Food Chain Looking Up:*

10 *Subcontractors Are Finding That Additional Insured Endorsements Are Giving Them*

11 *More Than They Bargained For*, 23 St. Louis U. Pub. L. Rev. 697, 700 (2004).  The

12 limited form indemnity requires the indemnitor to save and hold harmless the indemnitee

13 only for the *indemnitor*'s own negligence.  *Id.*  The intermediate form indemnity requires

14 the indemnitor to indemnify for all liability *excluding* that which arises out of the

15 indemnitee's sole negligence.  *Id.*  Finally, the broad form indemnity obligates the

16 indemnitor to save and hold harmless the indemnitee from *all* liability arising from the

17 project, "regardless of which party's negligence caused the liability." *Id.*

18        Courts and commentators have advanced a number of policy rationales to support

19 enforcement of limited and intermediate form indemnity clauses in construction-related

20 contracts.  "Indemnity agreements are a common device for shifting the burden of

21 liability from a tort-feasor to someone better able to bear the burden. The someone may

22 be an insurance company that is able to spread the risk better than the tort-feasor or it may

23 be another tort-feasor, who could have prevented the accident at lower cost than the

24 indemnitee. . . . Thus the agreement may well concentrate the costs of the accident on the

25 party that could have avoided them at lowest cost." *McMunn v. Hertz Equipment Rental*

26 *Corp.*, 791 F.2d 88, 91 (7th Cir. 1986).  Judicial enforcement of such cost-shifting

27 arrangements can reduce overall transaction costs for handling and resolving bodily

28 injury claims, encourage risk management strategies based on commercial general

1   liability insurance, and protect party autonomy.  3 Philip L. Bruner and Patrick J.

2   O'Connor, Jr, *Bruner & O'Connor on Constr. Law* § 10:9 (2002) (hereinafter *Constr.*

3   *Law*).

4           In *Washington Elementary Sch. Dist. No. 6 v. Baglino Corp.*, 169 Ariz. 58, 61, 817

5   P.2d 3, 6 (1991), for example, the Arizona Supreme Court enforced an intermediate form

6   indemnity clause in a construction contract that protected the indemnitee against "any

7   type of damage caused by the negligent behavior of the indemnitor, even though also

8   caused *in part* by the active negligence of the party indemnified," upon determining that

9   this was the "clear and unequivocal" intent of the parties.  (Emphasis in original.)

10          While limited and intermediate form indemnity clauses in construction contracts

11  may be used in Arizona to shift the risk of loss to an indemnitor even as to claims caused

12  *in part* by the active negligence of the indemnitee, *id*, broad form indemnity clauses that

13  purport to shift the entire risk of loss to an indemnitor, even as to liabilities caused by the

14  *sole negligence* of the indemnitee, are "against the public policy of this state" and "void"

15  under Arizona's anti-indemnity statute,  A.R.S. § 32-1159.  Under the heading,

16  "Indemnity agreements in construction contracts . . . void," the Arizona statute provides:

17          A covenant, clause or understanding in, collateral to or affecting a construction
            contract . . . that purports to indemnify, to hold harmless or to defend the promisee
18          from or against liability for loss or damage resulting from the sole negligence of
            the promisee or the promisee's agents, employees or indemnitee is against the
19          public policy of this state and is void.

20  A.R.S. § 32-1159(A).  The anti-indemnity statute applies broadly to "all [construction]

21  contracts entered into between private parties."  A.R.S. § 32-1159(C).  The Arizona

22  legislature defined the term, "construction contract," to mean "a written or oral agreement

23  relating to the construction, alteration, repair, maintenance, moving, demolition or

24  excavation or other development or improvement to land."  A.R.S. § 32-1159(D)(2).

25          The Arizona courts have yet to comment on Arizona's anti-indemnity statute, or

26  the slightly different provision found at A.R.S. § 34-226.  Nor have the parties identified

27  any legislative history that might assist the court in this case.  However, the courts of the

28  17 other states that have enacted similar "sole-negligence" anti-indemnification statutes

1    are in broad agreement as to the purpose and effect of such prohibitions.  *Aetna Cas. &*

2    *Sur. Co. v. Marion Equip. Co.*, 894 P.2d 664, 666 n.1 (Alaska 1995) (listing statutes).  As

3    summarized by one commentator, such statutes "achieve a more equitable distribution of

4    costs and risk of injury" in the construction industry, where disparities in bargaining

5    power are common, and misfortune is rarely the fault of one party alone.[5]  3 *Constr. Law*

6    §§ 10:71, 90.

7            The major public policy argument for prohibiting broad form indemnity clauses in

8    the construction industry was articulated by the Utah Supreme Court as follows:

9    "Undoubtedly, contracts exempting persons from liability for negligence induce a want of

10   care, for the highest incentive to the exercise of due care rests in a consciousness that a

11   failure in this respect will fix liability to make full compensation for any injury resulting

12   from the cause."  *Jankele v. Texas Co.*, 88 Utah 325, 329-30, 54 P.2d 425, 427 (1936).

13   Thus, to increase workplace safety, and to protect contractors from overreaching by

14   stronger counterparties, state legislatures have made it unlawful to agree, in a

15   construction-related contract, to impose costs on an inferior risk bearer through the

16   mechanism of a broad form indemnity.  *See* Samir B. Mehta, *Additional Insured Status in*

17   *Construction Contacts and Moral Hazard*, 3 Conn. Ins. L. J. 169, 181 (1996) (discussing

18   the issue in terms of "moral hazard").

19           Indiana's anti-indemnity statute provides a relevant example.  The Indiana

20   legislature concluded that it could increase safety at construction sites by prohibiting

21

22

23

24   _____

25           [5]Anti-indemnity statutes are also thought to increase the availability and affordability
     of commercial general liability insurance. 3 *Constr. Law* §§ 10:90.  "The majority of 'sole
26   negligence' prohibitions by their terms do not affect the validity of an insurance product.
     Thus, if an indemnitor procured an insurance policy that provided protection for an
27   indemnitee's sole negligence, then the indemnitee should be protected, notwithstanding the
28   statutory bar."  *Id.*

1    broad form indemnification provisions as set forth in Ind. Code § 26-2-5-1,[6] a provision

2    similar to the Arizona statute.  As the Court of Appeals for the Seventh Circuit explained:

3        Before [the anti-indemnification statute] was passed general contractors would
         negotiate with their subcontractors for a promise to indemnify the general
4        contractor if he was sued for a personal injury to a worker employed by a
         subcontractor at the construction site.  The legislature believed that this type of
5        agreement resulted in more accidents on the job. . . . If the general contractor can
         shift the financial burden of liability he may have less incentive to take measures
6        to make the construction site safe. . . . So, in sum, it is possible to understand how
         the Indiana legislature might have believed that banning indemnity agreements
7        might make construction workers safer.

8    *McMunn*, 791 F.2d at 92.  The Arizona courts are likely to adopt this reasoning to aid

9    their construction of A.R.S. § 32-1159.  While a promisor may not save and hold

10   harmless the promisee for liabilities caused by the promisee's "sole negligence," the

11   promisor may agree to indemnify for a lesser quantum of liability pursuant to a limited or

12   intermediate form indemnity consistent with the anti-indemnity statute.

13                    **2.        The Indemnity Agreement is Facially Invalid**

14            The indemnity clause in Section 16 of the Work Agreement demonstrates that the

15   parties intended for BNSF to be indemnified by A-Ceco for *all* liabilities "arising in any

16   manner" from A-Ceco's "acts, or omissions, or failures to perform," regardless of the

17   Railroad's causal, active, sole negligence.  (ASOF Ex. 5 § 16(b) (the liability assumed by

18   [A-Ceco] shall not be affected by the fact . . . that the . . . injury was *occasioned by* . . .

19   the negligence of Railroad) (emphasis added).)  This covenant is in direct conflict with

20   Arizona's anti-indemnity statute because it purports to shift the burden of FELA liability

21   from BNSF, the "promisee", to A-Ceco, the "promisor," even when the underlying claim

22

23   _____

24       [6]The Indiana statue provides, "All provisions, clauses, covenants, or agreements
     contained in, collateral to, or affecting any construction or design contract except those
25   pertaining to highway contracts, which purport to indemnify the promisee against liability
     for: (1) death or bodily injury to persons; (2) injury to property; (3) design defects; or (4) any
26   other loss, damage or expense arising under either (1), (2) or (3); from the sole negligence
     or willful misconduct of the promisee or the promisee's agents, servants or independent
27   contractors who are directly responsible to the promisee, are against public policy and are
     void and unenforceable."
28

1   "result[ed] from" the "sole negligence" of the promisee.  A.R.S. § 32-1159(A); (ASOF

2   Ex. 5 § 16(b)-(c)).  Thus, If BNSF were found solely responsible for the FELA liability,

3   as Plaintiffs themselves allege, then the Arizona statute would apply to void A-Ceco's

4   indemnification obligation *in toto*.

5               **i.      The Anti-Indemnity Statute Applies**

6          To avoid this result, BNSF argues that the Arizona anti-indemnity statute does not

7   apply to the broad form indemnity contained in Section 16 of the Work Agreement for a

8   variety of textual reasons.  (Doc. ## 82 at 8; 119 at 2, 4-5; 129 at 2.)  As an initial matter,

9   the Railroad's argument is severely weakened by the fact that BNSF has already admitted

10  that the Work Agreement is subject to the indemnity proscriptions governing construction

11  contracts in New Mexico and Washington.  BNSF and A-Ceco modified the

12  indemnification section of the Work Agreement to comply with New Mexico's N.M. Stat.

13  Ann. § 56-7-1, and Washington's RCW § 4.24.115, which are similar though not identical

14  to the Arizona statute.[7]  (ASOF Ex. 5 § 16(e)-(f).)  It is likely that the parties simply failed

15  ────────────────────────

16         [7]The New Mexico statute, which allows only limited form indemnity, provides in
17  relevant part, "A provision in a construction contract that requires one party to the contract
    to indemnify, hold harmless, insure or defend the other party to the contract, including the
18  other party's employees or agents, against liability, claims, damages, losses or expenses,
    including attorney fees, arising out of bodily injury to persons or damage to property caused
19  by or resulting from, in whole or in part, the negligence, act or omission of the indemnitee,
    its officers, employees or agents, is void, unenforceable and against the public policy of the
20  state."  N.M. Stat. Ann. § 56-7-1.
21         The Washington statute similarly provides, "A covenant, promise, agreement or
    understanding in, or in connection with or collateral to, a contract or agreement relative to
22  the construction, alteration, repair, addition to, subtraction from, improvement to, or
23  maintenance of, any building, highway, road, railroad, excavation, or other structure, project,
    development, or improvement attached to real estate, including moving and demolition in
24  connection therewith, purporting to indemnify against liability for damages arising out of
    bodily injury to persons or damage to property: (1) Caused by or resulting from the sole
25  negligence of the indemnitee, his agents or employees is against public policy and is void and
26  unenforceable; (2) Caused by or resulting from the concurrent negligence of (a) the
    indemnitee or the indemnitee's agents or employees, and (b) the indemnitor or the
27  indemnitor's agents or employees, is valid and enforceable only to the extent of the
28  indemnitor's negligence and only if the agreement specifically and expressly provides

1  to account for Arizona's statutory prohibition, which was enacted in 1993, when

2  negotiating the Work Agreement in January 1997.

3        The Railroad nevertheless offers a variety of creative, but ultimately unavailing,

4  arguments as to why Section 32-1159 should not apply to void the "sole negligence"

5  indemnity at issue here.  First, BNSF argues that the statutory prohibition on sole-

6  negligence indemnity found in Chapter 10 of the Arizona Revised Statutes applies only to

7  "contractors," not "equipment rental companies" like A-Ceco.  (Doc. ## 119 at 7; 129 at

8  3); A.R.S. § 32-1101(D) ("Only contractors as defined in this section are licensed and

9  regulated by" Chapter 10 of the Arizona Revised Statutes.).  Assuming A-Ceco satisfies

10 the definition of a "contractor," the Railroad next attempts to salvage the sole-negligence

11 covenant running in its favor by arguing that the anti-indemnity statute may be invoked

12 only by "contractors" who are "licensed by the state."  (Doc. # 119 at 7); A.R.S. § 32-

13 1151 (making it "unlawful" for a "contractor" to bid on a contract or otherwise "act in the

14 capacity of" a contractor in Arizona without a license).  Finally, the Railroad contends

15 that the Contract for Construction or Other Work is not a "construction contract" subject

16 to the statutory prohibition on broad indemnity at Section 32-1159.  (Doc. # 119 at 8-9.)

17       All of these arguments are foreclosed by the text of A.R.S. § 32-1159 itself.  The

18 anti-indemnity statute applies broadly to "all contracts entered into between private

19 parties," subject to certain exceptions not relevant here.  A.R.S. § 32-1159(C).  There is

20 nothing in the text of Section 32-1159 itself to suggest that the Arizona legislature

21 intended to limit its proscription to "contractors," licensed or otherwise.  The limiting

22 principle of the statute is found elsewhere.  As stated in Section 32-1159(A), the statute

23 applies only to "architect-engineer professional service contracts" and "construction

24 contracts."  All agreements, whether written or oral, that are "furnished in connection

25 with" or "relating to" actual or proposed construction, alteration, repair, maintenance,

26

27 therefor."  RCW § 4.24.115.

28

- 15 -

1   moving, demolition, excavation, or other development or improvement to land, come

2   within the ambit of Arizona's prescription.  A.R.S. § 32-1159(D).

3          In this case, the Contract for Construction or Other Work expressly contemplates

4   construction activities.  The "Scope of Work" section commits A-Ceco to "expeditiously

5   perform and complete" a variety of tasks for BNSF, including "construction and

6   maintenance of bridges, culverts, tracks, switches, and railroad right-of-way."  (ASOF

7   Ex. 5 § 3(a) (emphasis removed).)   The facts of this case demonstrate that A-Ceco

8   engaged in such activities on at least one occasion for the Railroad's benefit.  BNSF

9   nevertheless avers that A-Ceco primarily "assisted BNSF with train derailment clean-up,

10  hazardous waste removal, track maintenance and repair," and provided equipment such as

11  "portable toilets, chairs, and tools."  (Doc. # 129 at 2.)  However, the aptness of the title,

12  "Contract for *Construction* or Other Work," is underscored by A-Ceco employee David

13  Robinson's use of A-Ceco's front end loader to pull a quarter-mile section of replacement

14  rail on July 12, 2004.  (Doc. ## 119 at 7, 129 at 3, 133 at 4-6.)

15         The Contract for Construction or Other Work is subject to the anti-indemnity

16  statute because it is a "construction contract" between "private parties" and is not

17  otherwise exempted from the prohibition on broad form indemnity.  A.R.S. § 32-1159.

18  The court will not add its own limiting principle when the statute so clearly provides its

19  own.  It would be strange to restrict the operation of a self-contained statute such as

20  Section 32-1159 simply because of its proximity to other regulations governing Arizona's

21  construction industry. What is more, applying the statute to this case would further the

22  purpose of the statute.  Invalidating the broad form indemnity running in the Railroad's

23  favor would concentrate the costs of the accident on the party that could have avoided

24  them at lowest cost, BNSF, while aligning the safety incentives of the parties to avoid

25  future misfortune.  The anti-indemnity statute looks to the subject matter of the agreement

26  rather than the legal status of the contracting party to achieve this result.

27

28

1       **3.    Intermediate Form Indemnity Remains**

2       Arizona's "sole negligence" anti-indemnity statute applies to Section 16 of the

3 Work Agreement for the reasons set forth above.  The court must now determine whether

4 Section 16's indemnity obligation is "void" in its entirety under Section 32-1159, or

5 whether the offending sole-negligence language may simply be excised, leaving the

6 balance of the provision, and a residue of indemnity, in effect.  The court has not been

7 favored with any controlling authority as to the effect of Arizona's anti-indemnity statute

8 upon a duly negotiated contractual indemnity clause.  In the absence of any contrary

9 Arizona authority or legislative history, the court will adopt the majority rule articulated

10 by the courts of Alaska, Michigan, and Rhode Island, whereby an otherwise

11 unenforceable indemnity agreement is permitted to remain in effect unless and until it is

12 shown to violate the statutory proscription on the facts of each particular case.  Under this

13 rule of construction, the court will interpret Sections 16(b) and (c) of the Work

14 Agreement so as to exclude FELA indemnity for the Railroad's "sole negligence," A.R.S.

15 § 32-1159(A), but permit indemnity where BNSF and A-Ceco are shown to be jointly

16 responsible for Plaintiffs' injuries.  In so holding, the court honors A-Ceco's promise to

17 indemnify the Railroad to the "maximum extent possible" under Arizona law.  (ASOF Ex.

18 5 § 32 ("Severability Clause").)

19       **i.    The Alaska Rule**

20       Alaska's anti-indemnity statute is similar that of Arizona.[8]  Like A.R.S. § 32-1159,

21 the Alaska statute prohibits broad form indemnity, but allows cost-shifting in a

22 construction contract on all liabilities *excluding* those arising out of the indemnitee's sole

23

24       [8]Section 45.45.900, Alaska Statutes, provides in relevant part, "A provision, clause,

25 covenant, or agreement contained in, collateral to, or affecting a construction contract that
purports to indemnify the promisee against liability for damages for (1) death or bodily injury

26 to persons, (2) injury to property, (3) design defects, or (4) other loss, damage or expense
arising under (1), (2), or (3) of this section from the sole negligence or wilful misconduct of

27 the promisee or the promisee's agents, servants, or independent contractors who are directly

28 responsible to the promisee, is against public policy and is void and unenforceable."

negligence.  In *Rogers & Babler v. State of Alaska*, 713 P.2d 795 (Alaska 1986), the indemnitee sought to recover settlement and defense costs from a general contractor indemnitor on a theory of contractual indemnity.  The indemnification provision in the construction contract provided, "Contractor shall indemnify  and save harmless [the indemnitee] . . . from all suits, actions, or claims of any character brought because of any injuries or damage received or sustained by any person . . . on account of the operations of said Contractor; . . . or because of any act or omission, neglect, or misconduct of said Contractor."  *Id*. at 797.  The indemnitor urged the court to invalidate this provision under A.S. § 45.45.900 because, though it did not expressly indemnify for the indemnitee's sole negligence, it was broad enough to encompass that obligation.  The Alaska Supreme Court rejected the "per se" rule of invalidity advanced by the indemnitor as follows:

> We are not inclined to accept a reading of the statute that would invalidate the indemnity provisions in every contract entered into between the [indemnitee] and construction contractors.  We think A.S. 45.45.900 should come into effect only when it is determined, as between the [indemnitee] and the contractors, that the [indemnitee] is solely negligent.  This court has held that an ambiguous statute should be construed in the most beneficial way the language will permit to avoid hardship, forfeiture or injustice.  The indemnity provision involved here is not against public policy as a general proposition, but is only against public policy in those instances that it purports to indemnify the [indemnitee] for its negligence in the absence of contractor negligence.

*Id*. at 798 (citation and internal quotations omitted).

Summary judgment for the indemnitee was inappropriate in *Rogers & Babler* because the applicability of the statute was subject to evidentiary dispute.  "The indemnity clause may govern in the present case if the accident occurred 'on account of the operations of the contractor' and if it was not caused by the sole negligence of the state," the court observed.  *Id*. at 798.  However, the indemnitee had "not established an absence of genuine issues of material fact concerning these points."  *Id*. at 798.  A trial was necessary to resolve the dispositive issues of fact.

Unlike the clause at issue in *Rogers & Babler*, the indemnification clause in this case expressly provides for cost-shifting even as to liabilities occasioned by the sole negligence of the indemnitee.  (ASOF Ex. 5 § 16(b) ("The liability assumed by [A-Ceco]

1    shall not be affected by the fact, if it is a fact, that the destruction, damage, death, or

2    injury was *occasioned by* . . . the negligence of Railroad.") (emphasis added).)  But this

3    distinction is of no moment in light of the Work Agreement's severability clause.  Section

4    32 provides, "To the maximum extent possible, each provision of this Agreement shall be

5    interpreted in such a manner as to be effective and valid under applicable law, but if any

6    provision of this Agreement shall be prohibited by, or held to be invalid under, applicable

7    law, *such provision shall be ineffective solely to the extent of such prohibition or*

8    *invalidity*, and this *shall not invalidate the remainder of such provision* or any other

9    provision of this Agreement." (ASOF Ex. 5 § 32 (emphasis added).)  "If it is clear from

10   its terms that a contract was intended to be severable, the court can enforce the lawful part

11   and ignore the unlawful part." *Olliver/Pilcher Ins. v. Daniels*, 148 Ariz. 530, 533, 715

12   P.2d 1218, 1221 (1986).  Section 32 evinces the requisite intent.  (*See also* doc. # 133 at 7

13   (further evidence of A-Ceco's intent to indemnify).)  Therefore, upon a finding of

14   concurrent negligence, the court will excise only that portion of the covenant that purports

15   to indemnify the Railroad even as to liabilities "occasioned by" its sole negligence, and

16   maintain the intermediate form indemnity in full force and effect.  *See Hart v. Bell*, 222

17   Minn 69, 76, 23 N.W.2d 375, 379 (1946) ("It is not the province of courts to emasculate

18   the liberty of contract by enabling parties to escape their contractual obligations on the

19   pretext of public policy unless the preservation of the public welfare imperatively so

20   demands.  [T]he power of courts to declare a contract void for being in contravention of

21   sound public policy is a very delicate and undefined power, and, like the power to declare

22   a statute unconstitutional, should be exercised only in cases free from doubt.") (citations

23   and internal quotations omitted).

24        The court is persuaded to adopt the "wait and see" approach adopted by the Alaska

25   Supreme Court in *Rogers & Babler*, which promotes party autonomy while remaining

26   faithful to the purpose of the prohibition on "sole negligence" indemnity.  Under this rule

27   of decision, Arizona's anti-indemnity statute, A.R.S. § 32-1159, invalidates broad form

28   indemnity clauses only if the provision is actually applied, as between the parties, to

1   indemnify an indemnitee for the indemnitee's own sole negligence.  If the statute does not

2   apply, then the Railroad may maintain an action on the contract to enforce the residuum

3   of indemnity that remains after judicial construction of the clause.  *Accord Ford v. Clark*

4   *Equip. Co.*, 274 N.W.2d 33, 36, 87 Mich. App. 270, 276 (Ct. App. 1978) (When

5   confronted with Michigan's "sole-negligence" anti-indemnity statute on similar facts, the

6   court opted to bifurcate an otherwise invalid broad form indemnification clause into two

7   promises: one to indemnify the indemnitee for its sole negligence, which was

8   unenforceable, and the other to indemnify if the injury was caused in part by the

9   indemnitee's negligence, which was not subject to the statute and could therefore be

10  enforced. The court said, "It does no violence to either the contracting party's intent or

11  the statute to sever this independent, unenforceable promise from the rest of the

12  indemnity clause on the facts of this case.") *disapproved on other grounds by Grand*

13  *Trunk W. R.R., Inc. v. Auto Warehousing Co.*, 262 Mich App. 345, 686 N.W.2d 756 (Ct.

14  App. 2004).

15      To this same effect is *Cosimini v. Atkinson-Kiewit Joint Venture*, 877 F. Supp. 68,

16  71 (D.R.I. 1995).  Rhode Island law permits only limited form indemnity: an indemnitor

17  in a construction contract can indemnify for its own negligence, but it cannot assume

18  liabilities caused by or resulting from the negligence of the indemnitee.  R.I. Gen. Laws §

19  6-34-1.  The contractual provision at issue in *Cosimini* was facially invalid because it

20  purported to hold a subcontractor fully responsible for indemnification even when the

21  negligence of *both* the general contractor, the indemnitee, and the subcontractor, the

22  indemnitor, contributed to the plaintiff's injuries.  "In the event that the contract calls for

23  a subcontractor to indemnify the general contractor for its own negligence and for that of

24  the general contractor, the former obligation is enforceable, while the latter obligation is

25  unenforceable," the court found.  *Id.*  After concluding that "the parties intended to create

26  a duty to indemnify broader than but including the subcontractor's obligation to

27  indemnify the general contractor in proportion to the subcontractor's negligence," the

28  court modified the otherwise unenforceable clause (1) to void any portion of the clause

1   purporting to obligate the subcontractor to pay for the general contractor's negligence,

2   and (2) to preserve that portion of the clause requiring the promisor to indemnify the

3   promisee attributable to the promisor's percentage of negligence.  *Id.*

4       The court is not persuaded by the contrary authorities identified by A-Ceco, the

5   majority of which do not discuss anti-indemnity statutes at all.  (Doc. # 152.)  The only

6   case A-Ceco cites that does address the effect of an anti-indemnity statute upon a facially

7   invalid indemnity clause, *Jackson v. Associated Scaffolders & Equip. Co.*, 152 N.C. App.

8   687, 568 S.E.2d 666 (Ct. App. 2002), does not discuss the line of cases set forth above,

9   and has limited precedential value because of its dissent.  While the majority in *Jackson*

10  concluded without textual analysis that the indemnity covenant was void per se under

11  N.C. Gen. Stat. § 22B-1, *id.*, the dissent more convincingly determined that the facially

12  invalid paragraph could be stricken from the contract without doing violence to the

13  overall purpose of the agreement.  *Id.* at 693, 568 S.E.2d at 669-70 (quoting *Int'l Paper*

14  *Co. v. Corporex Corp.*, 96 N.C. App. 312, 315-16, 385 S.E.2d 553, 555 (Ct. App. 1989)

15  (a facially invalid indemnity provision may be severed from an otherwise enforceable

16  construction contract under North Carolina law provided that it is not a "central feature"

17  of the agreement)).

18      **4.**    **Application of the Alaska Rule to This Case**

19      On this Motion, as in *Rogers & Babler,* the Railroad has not established beyond

20  dispute that A-Ceco contributed to the loss.  Indeed, BNSF acknowledged at oral

21  argument that it has not moved for a determination on summary judgment that A-Ceco

22  employee David Robinson acted negligently when he followed BNSF Roadmaster

23  Kenner's instruction to "pull the rail." (ASOF  Ex. 6 at 29.)  Even if it had so moved, the

24  only probative evidence on this record is that the Railroad was solely responsible for

25  Plaintiffs' injuries, as James, Castillo, and Manygoats themselves allege.  *Compare* (doc.

26  ## 129 at 4-5; 130 (summarizing BNSF's allegations of A-Ceco negligence)) *with* (doc. #

27  133 at 8-11 (noting the Railroad's selective quotation of deposition testimony)).

28  Therefore, summary judgment on the enforceability of Section 16's indemnification

1  provision is inappropriate because the record does not show, as a matter of law, that

2  Plaintiffs' injuries were caused by the negligence of anyone other than BNSF.

3       If the trier of fact determines that Plaintiffs' injuries "result[ed] from the sole

4  negligence" of the Railroad, then a claim of indemnity under the Work Agreement will

5  not lie.  A.R.S. § 32-1159(A).  If, in contrast, the trier of fact concludes that A-Ceco was

6  to any extent responsible for the FELA liability, then the statute would not bar a claim for

7  contractual indemnity under the Work Agreement.  Thus, A-Ceco would be obligated by

8  contract, as narrowed by the statute, to indemnify BNSF.

9       Assuming once again for the sake of argument that A-Ceco is at least in partially

10  responsible for Plaintiffs' injuries, then A-Ceco would be required under the modified

11  indemnification clause not only to assume the Railroad's FELA liability, but also to

12  defend the Railroad in this action.  By its own terms, Section 16(d) requires A-Ceco to

13  come to the Railroad's defense on "any claim or cause of action arising or growing out of

14  or in any manner connected with *any liability assumed* by [A-Ceco] under this

15  Agreement."  (ASOF Ex. 5 § 16(d) (emphasis added).)  The triggering liability in this

16  case is A-Ceco's promise to indemnify.[9]  If the statute voids that obligation, then A-Ceco

17  is not required to "appear and defend" under Section 16(d) because it has not "assumed" a

18  liability under the Work Agreement.  If the statute does not apply, then A-Ceco is

19  required to defend against the negligence action on the Railroad's behalf. .

20       However, in this case Plaintiffs' Complaint does not allege any negligence on the

21  part of A-Ceco, as Plaintiffs' counsel confirmed at oral argument.  A-Ceco's duty to

22  defend cannot be enforced on summary judgment unless contributing negligence on the

23  part of A-Ceco is established as a matter of law.  As noted above, BNSF has neither

24  proved nor attempted to prove that. Therefore, the Railroad's Motion for Summary

25

26      [9]The wording of the Work Agreement's defense obligation disposes of the Railroad's

27  related contention that, even if Section 32-1159 did obviate A-Ceco's duty to *indemnify*, the
statute does not relieve A-Ceco of its duty to *defend* BNSF against Plaintiffs' FELA claim.

28  (Doc. # 119 at 9.)

1   Judgment on A-Ceco's duty to defend (Count I), failure to defend (Count II), and failure

2   to indemnify (Count V) must be denied pending resolution of the above mentioned issues

3   of material fact regarding the applicability of A.R.S. § 32-1159.

4          **D**.          **Duty to Obtain FELA Insurance and Procure Sufficient Insurance**

5          The Railroad's final grounds for summary judgment also fail.  (Doc. # 119 at 10-

6   11.)  First, BNSF contends that A-Ceco breached the Work Agreement by failing to

7   procure commercial general liability coverage for FELA claims.  There is nothing in the

8   Contract for Construction or Other Work, however, to support the Railroad's claim. Next,

9   the Railroad contends that A-Ceco breached the Work Agreement by failing to procure

10  commercial general liability insurance in the amount of $2,000,000 per occurrence, and,

11  and $6,000,000 in the aggregate, as required by Section 18(a)(2).  This, too, is unavailing,

12  as the $1,000,000 per occurrence policy purchased by A-Ceco was buttressed by an

13  additional $1,000,000 of per occurrence coverage under an "umbrella policy," and the

14  $6,000,000 aggregate requirement is not relevant to this dispute.

15          **1.          FELA Insurance Not Required under the Work Agreement**

16          The "Insurance" section of the Work Agreement provides, "Before commencing

17  any work under this Agreement, [A-Ceco] must provide and maintain in effect insurance,

18  at [A-Ceco's] expense, covering all of the work and services to be provided hereunder . . .

19  as described below[.]"  (ASOF Ex. 5 § 18.)  A-Ceco agreed to procure, among other types

20  of insurance, (1) "Commercial General Liability insurance covering liability, including

21  but not limited to . . . Personal Injury and Property Damage, with coverage of at least

22  $2,000,000 per occurrence and $6,000,000 in the aggregate"; (2) "Contractual Liability

23  insurance covering all of the liability assumed by the Contract under the provisions of this

24  Agreement, with coverage of a least $2,000,000 combined single limit or the equivalent;"

25  and (3) "Railroad Protective Liability insurance stating [BNSF] is the Named Insured

26  covering all of the liability assumed by [A-Ceco] under the provisions of this Agreement

27  with coverage of at least $2,000,000 per occurrence and $6,000,000 in the aggregate."

28  (*Id*. Ex. 5 § 18(a)(2), (4), (5).)

1    A-Ceco did not expressly covenant, whether under the rubric of "Insurance" or

2    under any other section of the Work Agreement, to purchase insurance for Federal

3    Employers' Liability Act claims alleged against the Railroad.  As discussed at oral

4    argument, A-Ceco's obligation to procure "Railroad Protective Liability insurance," does

5    not encompass a duty to provide insurance for FELA claims.  A-Ceco did agree, in

6    Section 16 of the Work Agreement, to *indemnify* the Railroad for FELA liabilities, as

7    discussed above.  (*Id*. Ex. 5 § 16(b),(c).)  However, the court cannot say, as a matter of

8    law, whether A-Ceco's duty to obtain "Contractual Liability insurance" against "any

9    liability assumed by the Contractor under the provisions of [the Work Agreement]"

10   encompassed an obligation to provide insurance for FELA liabilities assumed by A-Ceco

11   under the indemnification clause.  The somewhat enigmatic phrase, "Contractual Liability

12   insurance" is not defined by contract, and the Railroad's papers shed no light upon its

13   meaning.  Even if the contractual liability insurance clause did obligate A-Ceco to

14   procure insurance to cover the FELA indemnity, which it likely does not, the court cannot

15   determine whether that insurance policy would even be available to the Railroad in this

16   case.  For if Section 32-1159 applies to invalidate the indemnification obligation, then A-

17   Ceco has not "assumed" any liability under Section 16 of the Work Agreement to which

18   the "contractual liability insurance" could potentially apply.  Summary judgment would

19   not be appropriate on so contingent an argument.

20          **2.    The Commercial General Liability Policy Was Sufficient**

21          A-Ceco purchased and maintained commercial general liability ("CGL" coverage

22   in accordance with Section 18(a)(2) from Zurich North America ("Zurich").  Zurich

23   provided CGL coverage to A-Ceco and BNSF through its subsidiary, Steadfast Insurance

24   Company, from September 13, 2002, through September 13, 2003.  (BSOF Ex. 4.)  A-

25   Ceco renewed that Policy for an additional one-year period beginning September 13,

26   2003.  (*Id*. Ex. 4.)  A-Ceco caused a Certificate of Liability Insurance to be sent to BNSF

27   naming the Burlington Northern and Santa Fe Railway Company as an "additional

28   insured."  (*Id*. Ex. 4.)

The Policy in effect at the time of the railroad accident provided commercial general liability insurance to the "insureds" in the amount of $1,000,000 per occurrence, and $3,000,000 aggregate.  (BSOF Ex. 4.)  When viewed in isolation, these policy limits appear to place A-Ceco in breach of its duty to provide general liability insurance "with coverage of at least $2,000,000 per occurrence and $6,000,000 in the aggregate," as the Railroad contends.  (ASOF Ex. 5 § 18(a)(2).)  However, the Railroad fails to account for the fact, disclosed in the Certificate of Insurance, that A-Ceco maintained an "Excess/Umbrella Policy" for the Railroad's benefit in the amount of $1,000,000 per occurrence.  (BSOF Ex. 4.) This umbrella policy satisfies A-Ceco's $2,000,000 per occurrence obligation to the Railroad when viewed in combination with the liability coverage provided by Zurich.  Section 18(a)(2) does not require A-Ceco to maintain the $2,000,000 of CGL insurance with only one carrier, as BNSF appears to contend.

Furthermore, the fact that A-Ceco maintained $3,000,000, rather than $6,000,000 in "aggregate" CGL coverage is of no moment here, because Zurich's "aggregate" coverage limit is not implicated by Plaintiffs' FELA claim.  The "aggregate" limit is the total amount for which the insurer will indemnify the insured for any one or several occurrences during the entire policy period.  (*Id.* Ex. 4 § V(11) (In the Zurich Policy, "occurrence," means "an accident, including continuous or repeated exposures to substantially the same general harmful conditions.").)  In this case, there was only one "occurrence," or "accident," for which liability coverage is claimed.  12 Steven Plitt et al., *Couch on Insurance* § 172:12 (3d ed. 1995) (if all the injuries stem from one, continuous cause, then there is only one occurrence, whereas if injuries stem from multiple causes, then there are multiple occurrences).   A-Ceco has supplied the $2,000,000 "per occurrence" CGL coverage mandated by the Work Agreement.  Therefore, even if A-Ceco did breach its obligation to obtain  $6,000,000 of aggregate CGL coverage, that breach is not relevant here.

1
2

        IT IS THEREFORE ORDERED that Third Party Plaintiff Burlington Northern
Santa Fe Railway Company's Motion for Summary Judgment (doc. # 82) is denied.

3

        DATED this 27th day of August 2007.

4
5
6

_____
Neil V. Wake
United States District Judge

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28