1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8   Harold James, Peter Castillo, and Lee H.)   No. CV05–04106-PCT-NVW
    Manygoats,                              )
9                                           )   **ORDER**
              Plaintiffs,                   )
10                                          )
    vs.                                     )
11                                          )
    Burlington  Northern  Santa  Fe  Railway)
12  Company; John Does I-V, husbands and)
    wives; Black Partnerships I-V; and White)
13  Corporations I-V,                       )
                                            )
14            Defendants.                   )
                                            )
15  ———————————————————————)
    Burlington  Northern  Santa  Fe  Railway)
16  Company, a Delaware Corporation,        )
                                            )
17            Third Party Plaintiff,        )
                                            )
18    v.                                    )
                                            )
19  A-Ceco  Equipment  Company,  Inc.,  an)
    Arizona   corporation;   Zurich   North)
20  America   d/b/a   Steadfast   Insurance)
    Company, a Texas corporation; John Doe)
21  VI; Black & White Corporations VI-X,    )
                                            )
22            Third Party Defendants.       )
    ———————————————————————)
23

24        The court has before it Third Party Defendant Zurich North America's

25  ("Zurich's") Motion for Summary Judgment (doc. # 75) and supporting Statement of

26  Facts ("ZSOF") (doc. # 76); Burlington Northern Santa Fe Railway Company's

27  ("BNSF's" or "Railroad's") Response (doc. # 91) and Supporting Statement of Facts

28

("BSOF") (doc. # 91); and Zurich's Reply (doc. # 105).  Zurich's Motion will be granted for the reasons set forth below.

## I.   Background

### A.   The Underlying Negligence Action

Burlington Northern Santa Fe Railway employees Harold James, Peter Castillo, and Lee H. Manygoats ("Plaintiffs") were injured by a quarter-mile section of replacement rail while performing track maintenance near Flagstaff, Arizona on July 12, 2004.  (Doc. # 75 at 2.)  Front end loader operator and A-Ceco Equipment Company ("A-Ceco") employee David Robinson was performing under a Contract for Construction Or Other Work (the "Work Agreement") with BNSF when he caused the approximately 1,600 foot section of rail to "jump" into the gauge of Main Track Two, pinning James, Castillo, and Manygoats to the ground. The relevant facts are set forth in the related Order denying BNSF's Motion for Summary Judgment against A-Ceco.

Plaintiffs filed suit against the Railroad under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60 ("FELA"), on December 14, 2005, alleging negligent failure to provide a safe working environment and specifying a variety of damages.  (Doc. # 1.) The court has jurisdiction over Plaintiffs' statutory cause of action pursuant to 45 U.S.C. § 56.

### B.   The Railroad's Third Party Action

A-Ceco purchased and maintained commercial general liability ("CGL") insurance from Zurich North America to cover liabilities arising out of A-Ceco's performance under the Work Agreement.  (BSOF Ex. 1 § 18.)  A-Ceco is the "named insured," and BNSF is an "additional insured" under Policy Number SCO4917463-01 (the "Policy").  (BSOF Ex. 5.)  This is an insurance coverage dispute between Zurich and BNSF.

The Railroad joined Zurich as a Third Party Defendant after Zurich refused coverage for Plaintiffs' FELA claim.  (Doc. # 41; BSOF Ex. 11.)  The Railroad seeks a declaratory judgment stating that Zurich is in breach of the Policy and that Zurich must defend and indemnify BNSF against the FELA liability alleged by Plaintiffs (Count VIII).

(Doc. # 41 at 15.)  The Railroad also asserts claims for breach of contract (Counts IX and X), bad faith denial of insurance coverage (Count XI), and punitive damages (Count XII). (*Id* at 15-17.)

Subject matter jurisdiction over BNSF's third party claims, which sound in Arizona law, is conferred by 28 U.S.C. § 1367(a).  *Ellison v. Shell Oil Co.*, 882 F.2d 349, 352 (9th Cir. 1989) (third-party actions arising out of FELA claims governed by state law); *Shields v. Consolidated Rail Corp.*, 810 F.2d 397 (3d Cir. 1987)) (collecting cases).

### C.     Zurich's Motion for Summary Judgment

Zurich contends that it need not defend or indemnify the Railroad in the underlying negligence action because it excluded coverage for the FELA liability alleged by Plaintiffs.  (Doc. # 75 at 2.)  Under the insuring clause for Coverage A, "Bodily Injury and Property Damage Liability," Zurich is required to "pay those sums [up to the insurance limit] that the insured becomes legally obligated to pay as damages because of bodily injury or property damage," and to "defend any suit seeking those damages." (BSOF Ex. 4 § I(1)(a)(1).)  However, coverage for bodily injury and property damage liability "does not apply to . . . . [a]ny obligation of the insured under [the] Federal Employers['] Liability Act."  (*Id*. Ex. 4 § I(2)(d) as modified by Endorsement 14.) Plaintiffs' cause of action against the Railroad sounds exclusively in FELA.  (Doc. # 1.) Zurich urges the court to dismiss it from this action entirely because, based on the FELA exclusion, the insurer acted within its contractual rights in refusing to come to the Railroad's defense.  (Doc. # 75 at 2.)

BNSF defends on two grounds.  First, the Railroad argues that the FELA exclusion is no bar to recovery in this case because BNSF's claim against Zurich is based on A-Ceco's breach of contract, not Plaintiff's statutory negligence action.  (Doc. # 91 at 2.) Next, the Railroad argues that the FELA exclusion is ineffective under Arizona law because it "contradicts the reasonable expectations" of its insured, A-Ceco, and its additional insured, BNSF.  (*Id*.)  These arguments lack merit.

1

## II.    Summary Judgment Standard

2       Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment

3   is proper when "the pleadings, depositions, answers to interrogatories, and admissions on

4   file, together with affidavits, if any, show that there is no genuine issue as to any material

5   fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

6   P. 56(c).  The court must evaluate a party's motion for summary judgment construing the

7   alleged facts with all reasonable inferences favoring the nonmoving party.  *See Baldwin v.*

8   *Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001).  The evidence presented by the

9   parties must be admissible.  Fed. R. Civ. P. 56(e).  Conclusory and speculative testimony

10  in affidavits and moving papers is insufficient to raise genuine issues of fact and to defeat

11  summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.

12  1979).

13       The party seeking summary judgment bears the initial burden of informing the

14  court of the basis for its motion and identifying those portions of the pleadings,

15  depositions, answers to interrogatories, and admissions on file, together with the

16  affidavits, if any, which it believes demonstrate the absence of any genuine issue of

17  material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving

18  party has met its initial burden with a properly supported motion, the party opposing the

19  motion "may not rest upon the mere allegations or denials of his pleading, but . . . must

20  set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty*

21  *Lobby, Inc.*, 477 U.S. 242, 248 (1985).  Summary judgment is appropriate against a party

22  who "fails to make a showing sufficient to establish the existence of an element essential

23  to that party's case, and on which that party will bear the burden of proof at trial."

24  *Celotex Corp.*, 477 U.S. at 322.  *See also Citadel Holding Corp. v. Roven*, 26 F.3d 960,

25  964 (9th Cir. 1994).  Summary judgment is not appropriate when the nonmoving party

26  submits evidence from which a reasonable juror, drawing all inferences in favor of the

27  nonmoving party, could return a verdict in the nonmoving party's favor.  *United States v.*

28  *Shumway*, 199 F.3d 1093, 1103-04 (9th Cir. 1999).  Although the initial burden is on the

1    movant to show the absence of a genuine issue of material fact, this burden may be

2    discharged by indicating to the court that there is an absence of evidence to support the

3    nonmoving party's claims.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099,

4    1105-06 (9th Cir. 2000).

5    **III.    Legal Analysis**

6          In Arizona, "The interpretation of an insurance contract, including whether its

7    terms are ambiguous or uncertain, is a question of law for the court to decide."  *Thomas v.*

8    *Liberty Mut. Ins. Co.*, 173 Ariz. 322, 324, 842 P.2d 1335, 1337 (Ct. App. 1992) (citations

9    omitted).  The court will "read the policy as a whole to give a reasonable and harmonious

10   meaning and effect to all of its provisions."  *Associated Aviation Underwriters v. Wood,*

11   209 Ariz. 137, 158, 98 P.3d 572, 593 (Ct. App. 2004) (citation and internal quotation

12   omitted).   There is no ambiguity here.

13         **A.    The Zurich CGL Policy**

14         A-Ceco negotiated and maintained CGL coverage for BNSF's benefit as required

15   by Section 18 of the Work Agreement.  (BSOF Ex. 1 § 18(a)(2).)  Zurich provided that

16   coverage through its subsidiary, Steadfast Insurance Company.  (ZSOF Attach. A at 9.)

17   The first year of coverage began on September 13, 2002, and expired on September 13,

18   2003.[1]  A-Ceco renewed the Policy for an additional year commencing on September 13,

19   2003, and expiring on September 13, 2004.  (*Id*. Attach. C at 1.)  When it renewed the

20   Policy for 2002-2003, A-Ceco caused a Certificate of Liability Insurance (the

21   "Certificate") to be sent to BNSF naming the Burlington Northern and Santa Fe Railway

22   Company as an "additional insured."  (BSOF Ex. 5.)  That designation made BNSF an

23   "insured" under the CGL Policy, but "only as respects to the operations" of the named

24   insured A-Ceco.  (BSOF Ex. 4  Endorsement 15.)

25

26

27         [1]Other carriers provided insurance under the Contract for Construction or Other Work

28   prior to September 13, 2002.  (*See, e.g.,* BSOF Ex. 1 at Bates number BNSF0749.)

### 1.    Coverage A Definitions

At the time of the railroad accident, Zurich provided bodily injury and property damage liability insurance in the amount of $1,000,000 per occurrence, and $3,000,000 aggregate.  (*Id.* Ex. 5 (summarizing coverage limits).)  Coverage A, the only coverage relevant to this dispute,[2] applies to "bodily injury . . . caused by an occurrence in the coverage territory . . . during the policy period."  (*Id.* Ex. 4 §I(1)(b)(1)-(2).)  "Bodily injury" means, "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."  (*Id.* Ex. 4 § V(4).)  "Occurrence," in turn, "means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id.* Ex. 4 § V(11).)  "Coverage territory" means the "United States of America (including its territories and possessions), Puerto Rico, and Canada," as well as international waters and airspace subject to certain exceptions not relevant here.  (*Id.* Ex. 4 § V(5).)  The relevant "policy period" commenced on September 13, 2003, and expired on September 13, 2004.  (*Id.* Ex. 4.)

The underlying Complaint (doc. # 1) reveals that Plaintiffs' claim against the Railroad is predicated upon "bodily injury . . . caused by an occurrence in the coverage territory" within the 2003-2004 "policy period."  (*Id.* Ex. 4 §I(1)(b)(1)-(2).)  Therefore, under Section I(1) of the Policy, Zurich would appear to be liable for the Railroad's FELA loss, as well the costs of defending the statutory negligence suit, even though the liability has not been reduced to judgment.

### 2.    The FELA Exclusion

However, Coverage A's insuring agreement is subject to 16 exclusions, lettered "a" through "p."  Of primary importance here is exclusion "d," the FELA exclusion.  As

---

[2]Zurich's "Coverage B" extends to "Non-Bodily Injury" and "Advertising Injury," subject to limitations not relevant here.  (BSOF Ex. 4 §§ I, V(2), (13) (emphasis removed).) "Coverage C" covers "medical expenses . . . for bodily injury caused by an accident" on or near the insured's premises, or because of its operations, as limited by the FELA exclusion and other exclusions set forth in Coverage A.  (*Id.* Ex. 4 § I (emphasis removed).)

1  modified by Endorsement 14, exclusion "d" provides, "[Coverage A] does not apply to . .

2  . [a]ny obligation of the insured under [the] Federal Employers['] Liability Act."  (*Id*. Ex.

3  4 § I(2)(d); Endorsement 14.)  This unambiguous exclusion provides an independent basis

4  for denying coverage on any liability that falls within its scope.   "Endorsements are

5  modifications to the basic insuring forms in the policy and may alter or vary any term or

6  condition of the policy."  *Travelers Cas. & Sur. Co. v. Am. Int'l Surplus Lines Ins. Co.*,

7  465 F. Supp. 2d 1005, 1025 (S.D. Cal. 2006) (citing California law for the proposition

8  that "if there is a conflict in meaning between an endorsement and the body of the policy,

9  the endorsement controls") (citations and internal quotations omitted).  The policy and the

10  endorsement together constitute the contract of insurance, "and are to be read together to

11  determine the contract actually intended by the parties."  2 Steven Plitt et al., *Couch on

12  Ins.* § 18:17 (3d ed. 1995) (hereinafter *Couch*).   Therefore, while FELA coverage is

13  possible under the broadly worded insuring clause, Section I(1), such coverage is

14  expressly abrogated by the exclusion at Section I(2)(d) and Endorsement 14.

### 3.    The Contractual Liability Exclusion

16  Yet another exclusion provides, "[Coverage A] does not apply to . . . bodily injury

17  or property damage for which the insured is obligated to pay damages by reason of the

18  assumption of liability in a contract or agreement."  (*Id*. Ex. 4 §I(2)(b).)   This contractual

19  liability exclusion "functions to relieve the insurer of responsibility for any 'extra'

20  liability that the insured undertakes by contract beyond the liability imposed by law for

21  negligence."  *Olympic Inc., v. Providence Wash. Ins. Co.*, 648 P.2d 1008, 1011 n.6

22  (Alaska 1982).  The contractual liability exclusion limits Coverage A to bodily injury or

23  property damage liability "which the law imposes upon all insureds alike."  *Id*. (citation

24  omitted).

### 4.    The "Insured Contract" Exception to the Contractual Liability Exclusion

26

27  The second sentence of the contractual liability exclusion contains an important

28  exception for a limited range of contract-based claims.  The Policy provides, "Th[e]

1    [contractual liability] exclusion does not apply to liability for damages assumed in a

2    contract or agreement that is an insured contract, provided the bodily injury or property

3    damage occurs subsequent to the execution of the insured contract."  (BSOF Ex. 4 §

4    I(2)(b).)  An "insured contract" is defined as, "The part of any . . . contract or agreement

5    pertaining to your business under which you assume the tort liability of another to pay

6    damage because of bodily injury or property damage to a third person or organization, if

7    the contract or agreement is made prior to the bodily injury or property damage."  (*Id*. Ex.

8    4 § V(8)(f) as modified by Endorsement 2.)  "Tort liability," in turn, means "a liability

9    that would be imposed by law in the absence of any contract or agreement."  (*Id*. Ex. 4 §

10   V(8)(f).)  Endorsement Two modifies the standard definition of the term "insured

11   contract" so as to "afford coverage for the named insured [A-Ceco] in connection with

12   construction or demolition operations, on or within 50 feet of railroad tracks or railroad

13   property." (*Id*. Ex. 4  Endorsement 2.)

14          The exception to the exclusion for contractual liability coverage does not bring

15   ordinary breach-of-contract claims within the scope of CGL coverage.  The operative

16   language here is "assumption of tort liability."  This phrase "refers to liability incurred

17   when one promises to indemnify or hold harmless another, and does not refer to the

18   liability that results from breach of contract."  *Olympic*, 648 P.2d at 1011 (citing cases).

19   As explained by the Court of Appeals for the Fifth Circuit, "The assumption by contract

20   of the liability of another is distinct conceptually from the breach of one's contract with

21   another.  Liability on the part of the insured for the former is triggered by contractual

22   performance; for the latter liability is triggered by contractual breach."  *Musgrove v.*

23   *Southland Corp*., 898 F.2d 1041, 1044 (5th Cir. 1990) (citations omitted).  Courts have

24   distinguished in a variety of contexts between *incurring* liability through breach of

25   contract, and specifically contracting to *assume* liability for another's negligence pursuant

26   to an indemnification agreement.  2 Rowland H. Long, *The Law of Liability Ins.*, § 10:05,

27   n.30 (collecting cases); *In re the Liquidation of Excalibur Ins. Co.*, 519 N.W.2d 494, 497

28   (Minn. Ct. App. 1994) ("Contractual liability coverage does not cover claims for breach

of contract, but only covers tort liabilities of third parties that the insured has assumed by contract with the third party." (internal quotations omitted); *Gibson & Assocs. v. Home Ins. Co*, 966 F. Supp. 468, 476 (N.D. Tex. 1997) ("[J]urisdictions which have considered the issue have uniformly held that general liability policies do not encompass coverage for damages arising from the insured's breach of contract."). The Railroad loses sight of this distinction throughout its papers, and the error is fatal to it.

### B.   Application of the Insured Contract Exception in This Case

Coverage A provides, "We will pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage *to which this insurance applies*." (BSOF Ex. 4 § I(1)(a) (emphasis added).) Under the exception to the contractual liability exclusion, the CGL insurance applies to bodily injury or property damage liability *"assumed* in a contract" relating to the insured's business. "By creating an exception from exclusion (b) for [bodily injury or] property damage for which the insured becomes obligated to pay due to an indemnification agreement assumed in an 'insured contract,' [Zurich] thus has expressly agreed to provide a limited range of contractual liability coverage." *Gibson*, 966 F. Supp. at 476. The exception is "specifically designed to provide coverage for indemnification actions, notwithstanding the fact that the Policy may offer no coverage for breach of a contractual duty," the *Gibson* court explained. *Id*. But coverage for contractually assumed tort liability only exists, by definition, if (1) there is an enforceable indemnity agreement; and (2) the insured assumed a *covered* "bodily injury or property damage" liability by operation of that agreement. The applicability of the "insured contract" exception to this case is discussed below.

### 1.   The Facially Invalid Indemnification Agreement Is Potentially Enforceable

A-Ceco agreed, in Section 16 of the Work Agreement, to "indemnify and hold [the Railroad] harmless" for all liabilities, *including* FELA liabilities, "arising in any manner"

1  from A-Ceco's performance under the Work Agreement.[3]  (BSOF Ex. 1 § 16(b)-(c).)  A-

2  Ceco ostensibly agreed to indemnify BNSF even as to liabilities occasioned by the sole

3  negligence of the Railroad.  (*Id.* Ex. 1 § 16(b) ("The liability assumed by contractor shall

4  not be affected by the fact, if it is a fact, that the destruction, damage, death, or injury was

5  *occasioned by* . . . the negligence of Railroad.") (emphasis added). )  However, Arizona's

6  anti-indemnity statute, A.R.S. § 32-1159, modifies this broad form indemnity so as to

7  deny the Railroad indemnification on claims arising out of its own sole negligence, but

8  allow full indemnification where BSNF and A-Ceco share responsibility for the loss.

9      The only probative evidence on this record is that the Railroad was solely

10  responsible for Plaintiffs' injuries, as James, Castillo, and Manygoats themselves allege.

11  (Doc. # 133 at 8-11.)  However, as confirmed at oral argument, the parties have not

12  moved for a determination on summary judgment that the Railroad was solely at fault.

13  Therefore, at this stage of the litigation, the court cannot decide whether the Arizona

14

---

15      [3] Section 16 of the Work Agreement provides, subject to a proviso for intentional

16  misconduct or gross negligence not implicated here:

17  (b)    [A-Ceco] shall indemnify and hold harmless Railroad for all judgments, awards, claims, demands, and expenses (including attorneys' fees), for injury or death to all

18  persons, including Railroad's . . . employees, . . . arising in any manner from [A-Ceco's] . . . acts or omissions or failure to perform any obligation hereunder.  **THE**

19  **LIABILITY ASSUMED BY [A-CECO] SHALL NOT BE AFFECTED BY THE FACT, IF IT IS A FACT, THAT THE DESTRUCTION, DAMAGE, DEATH**

20  **OR INJURY WAS OCCASIONED BY OR CONTRIBUTED TO BY THE NEGLIGENCE OF RAILROAD, ITS AGENTS, SERVANTS, EMPLOYEES,**

21  **OR OTHERWISE[.]**

22  (c)    **THE INDEMNIFICATION OBLIGATION ASSUMED BY [A-CECO] SHALL INCLUDE ANY CLAIMS, SUITS OR JUDGMENTS BROUGHT AGAINST**

23  **RAILROAD UNDER THE FEDERAL EMPLOYERS['] LIABILITY ACT**.

24  (d)    [A-Ceco] further agrees, at its expense, in the name and on behalf of Railroad, that it shall adjust and settle all claims made against Railroad, and shall, at Railroad's

25  discretion, appear and defend any suits or actions at law or in equity brought against

26  Railroad on any claim or cause of action arising or growing out of or in any manner connected with any liability assumed by [A-Ceco] under this Agreement for which

27  Railroad may be liable or is alleged to be liable.

28  (BSOF Ex. 1 § 16 (emphasis in original).)

1  statute applies to void A-Ceco's indemnity obligation *in toto*, or whether indemnity

2  remains based on a residuum of A-Ceco negligence.

### 2. A-Ceco's Covenant to Indemnify for FELA Liabilities Is an "Insured Contract," but Coverage A Is not Available

The court will assume, for the purposes of discussion only, that the finder of fact

resolves the issue in favor of the Railroad by concluding that BNSF and A-Ceco share

responsibility for Plaintiffs' injuries.  Under that assumption, A-Ceco would have a duty

under Section 16 of the Work Agreement, as narrowed by the statute, to indemnify BNSF

for the entire FELA liability.  A.R.S. § 32-1159.  This indemnity is an "insured contract"

because (1) A-Ceco "assume[d] the tort liability of [BSNF] to pay damage because of

bodily injury . . . to a third person," and (2) Plaintiffs' "bodily injury . . . occur[red]

subsequent to the execution" of the Work Agreement.  (BSOF Ex. 4 §§ I(2)(b), V(8)(f).)

Continuing to assume for the sake of argument that A-Ceco was at least partially

responsible for Plaintiffs' injuries, A-Ceco would also have an independent duty to

defend the Railroad against Plaintiffs' claim. (BSOF Ex. 1 § 16(d) (A-Ceco must "appear

and defend" against "any claim or cause of action arising or growing out of . . . *any*

*liability assumed* by [A-Ceco] under this Agreement") (emphasis added).)

If A.R.S. § 32-1159 does not void Section 16 of the Work Agreement, then the

"insured contract" exception to the contractual liability exclusion extends Coverage A to

*all* BNSF tort liabilities assumed by A-Ceco pursuant to the modified indemnification

provision.  However, coverage under the exception to the exclusion is defeated by the

stand-alone exclusion for FELA liabilities at Section I(2)(d) and Endorsement 14.  This

result follows from the plain language of the Policy itself.  The exception to the exclusion

for contractual liability found in the second sentence of Section I(2)(b) does not, by its

own terms or by implication, modify any of the 15 other Policy exclusions.

 "A contract for insurance, like any other contract, is not a collection of separate

unrelated parts; each part must be read and interpreted in connection with all other parts."

*Nichols v. State Farm Fire & Casualty Co.*, 175 Ariz. 354, 356, 857 P.2d 405, 408 (Ct.

App. 1993) (citation and internal quotations omitted).  Reading the exception to the exclusion in harmony with all the other parts of the Policy gives meaning to all the Policy's provisions. *Tucker v. Byler*, 27 Ariz. App. 704, 707, 558 P.2d 732, 735 (1976). For example, Coverage A would not apply to A-Ceco's assumption of BNSF liability for "expected or intended" injuries, damage caused by pollution, or damage due to war or civil insurrection.  (BSOF Ex. 1 §I(2)(a), (f), (i).)  Each of these exclusions is, like the FELA exclusion, alone sufficient to deny coverage on any claim that comes within its sweep.  Thus, although coverage for the FELA liability asserted against BNSF and assumed by A-Ceco is potentially available under the exception to the exclusion at Section I(2)(b), that coverage is expressly abrogated by the FELA exclusion set forth in Section I(2)(d), Endorsement 14.  Zurich carved out coverage for FELA liabilities, and Plaintiffs urge no other theory of recovery.  Therefore, Coverage A is not available in this case as a matter of law.

A-Ceco promised to indemnify the Railroad for its FELA liabilities, and that promise may or may not be enforceable under Arizona's anti-indemnify statute.  But Zurich is not affected either way, as the CGL Policy it underwrote conclusively denies coverage for Plaintiffs' claims.  The FELA exclusion is not "irrelevant to A-Ceco's right to coverage," as the Railroad repeatedly asserts.  (Doc. ## 146 at 5; 91 at 4 ("BNSF's claims . . . are not based on the FELA, but rather, on A-Ceco's clear contractual duty to defend and indemnify BNSF"), 7-8 ("Endorsement 14 was not intended as a substantive exclusion, but rather to confirm that [Zurich] would not cover injury claims A-Ceco's employees might file against A-Ceco").)   Instead, the FELA exclusion provides Zurich with an absolute defense to any claim arising out of Plaintiffs' statutory negligence action.  This is true regardless of whether the Railroad attempts to shift its FELA liability to Zurich directly under the insuring agreement, Section I(1), or  indirectly by operation of the "insured contract" exception to the exclusion for contractual liability coverage, Section I(2)(b).  To hold otherwise would be to read the FELA exclusion out of the Policy entirely.

1

### C.    A "Reasonable Expectation" of FELA Coverage

The Railroad contends that considerations outside of the four corners of the Policy require that the FELA exclusion be stricken.  (Doc. # 91 at 8-13.)  BNSF advances this argument under the rubric of the "reasonable expectations doctrine."  *Darner Motor Sales v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 682 P.2d 388 (1984).  The argument proceeds on two fronts.  First, the Railroad contends that A-Ceco, the named insured, had a "reasonable expectation" of FELA coverage as evidenced by (1) the deposition testimony of Brad Russell, A-Ceco's Chairman and supervisor of operations, Trudy Hepfner, Zurich's regional manager for the Railroad Department, and Kevin Duffy, a Zurich claims representative; and (2) Zurich's coverage of a prior negligence action allegedly involving a BNSF employee who was injured by an A-Ceco backhoe. (Doc. # 146 at 2-3, 5-6.)  Second, BNSF contends that the Railroad itself had a "reasonable expectation" of FELA coverage based on a Certificate of Liability Insurance that does not mention the FELA exclusion.  (*Id*. at 5-6; doc. # 91 at 8-12.)  There is no merit to either contention.

### 1.    Arizona's Reasonable Expectations Doctrine Applies

The reasonable expectations doctrine protects parties to standardized insurance contracts against overreaching by "hold[ing] the drafter to good faith and terms which are conscionable."  *Darner*, 140 Ariz. at 394, 682 P.2d at 399.  In accordance with "[t]he general rule of contract interpretations" adopted by the Restatement (Second) of Contracts and the late Arthur L. Corbin, "boilerplate terms which are contrary to either the expressed agreement or the purpose of the transaction as known to the contracting parties" are not given effect.  *Id*.  This consumer-protection doctrine, "essentially a relaxation of the rule barring parol evidence from being admitted to discern the intent of the parties to the contract," can "override even unambiguous contract provisions when an insured reasonably expected the provision to operate differently."  *Vencor Inc. v. Nat'l States Ins. Co.*, 303 F.3d 1024, 1035 (9th Cir. 2002) (citing *Gordinier v. Aetna Cas. & Sur. Co.*, 154 Ariz. 266, 272, 742 P.2d 277, 283 (1987)).  "It does not apply to *any*

1   circumstance in which an insurance policy is inconsistent with some other information an

2   insured obtains concerning coverage offered by that policy but only to those situations

3   that come within the purposes of the doctrine."  *Vencor*, 303 F.3d at 1037.

4        *Gordinier* lists a "limited variety of situations" in which Arizona courts will apply

5   the reasonable expectations doctrine to defeat unambiguous boilerplate insurance terms:

6        1.  Where the contract terms, although not ambiguous to the court, cannot be
         understood by the reasonably intelligent consumer who might check on his or her
7        rights, the court will interpret them in light of the objective, reasonable
         expectations of the average insured;

8
         2. Where the insured did not receive full and adequate notice of the term in
9        question, and the provision is either unusual or unexpected, or one that
         emasculates apparent coverage;

10
         3. Where some activity which can be reasonably attributed to the insurer would
11       create an objective impression of coverage in the mind of a reasonable insured;

12       4. Where some activity reasonably attributable to the insurer has induced a
         particular insured reasonably to believe that he has coverage, although such
13       coverage is expressly and unambiguously denied by the policy.

14   154 Ariz. at 272-73, 742 P.2d at 283-84; *see also Phila. Indem. Ins. Co. v. Barerra*, 200

15   Ariz. 9, 17, 21 P.3d 395, 403 (2001) (The *Darner* methodology applies to a limited

16   number of cases where an exclusion, limitation, or escape clause runs contrary to what a

17   reasonably intelligent consumer would expect, or when it significantly diminishes

18   coverage that the policy purports on its face to provide.  In that case, the surrounding facts

19   and circumstances must be considered to determine whether, and to what extent, there

20   was a meeting of the minds between the contracting parties.)

21        The court has not been favored with any authority as to the applicability of *Darner*

22   and its progeny to sophisticated insureds such as the A-Ceco Equipment Company and

23   the Burlington Northern Santa Fe Railway Company.  However, the Arizona courts are

24   likely to apply the reasonable expectations doctrine, regardless of the insured's

25   commercial status, where the insured alleges that it did not know and had no reason to

26   know of the existence of an exclusion of coverage in a standardized insurance contract.

27   *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 904 (3d Cir. 1997) (rationale of the

28   reasonable expectations doctrine is still available when the insurer unilaterally alters the

1  insurance coverage requested by a sophisticated insured, as insurer has a duty to advise

2  the insured of the changes made); *Zuckerman v. Transamercia Ins. Co.*, 133 Ariz. 139,

3  144, 650 P.2d 441, 446 (1982) (noting the unique circumstances under which insurance

4  contracts are negotiated, where the insured seldom sees the policy before purchasing the

5  policy, and negotiation usually focuses on coverage limits not policy terms); *Services*

6  *Holding Co. v. Transamerica Occidental Life Ins. Co.*, 180 Ariz. 198, 204, 883 P.2d 435,

7  441 (Ct. App. 1994) (*Darner* can apply to the "reasonable expectations" of insurance

8  agents); Eugene R. Anderson & James J. Fournier, *Why Courts Enforce Insurance*

9  *Policyholders' Objectively Reasonable Expectations*, 5 Conn. Ins. L.J. 335, 369 (1998)

10 (discussing the "fallacy of the sophisticated policy holder").

11 **2.      The Railroad's *Celotex* Burden**

12 Zurich has moved for a determination on summary judgment that its insureds'

13 expectation of FELA coverage was unreasonable as a matter of law.  (Doc. ## 75 at 5-7;

14 153.)  Having put the Railroad to its *Celotex* burden on this issue, it is incumbent upon

15 BNSF to "set forth specific facts showing that there is a genuine issue for trial."

16 *Anderson*, 477 U.S. at 248.   The Railroad has failed to generate a triable issue regarding

17 the applicability of the *Darner* doctrine in this case.  Summary judgment under Fed. R.

18 Civ. P. 56(c) is appropriate because a reasonable juror, drawing all reasonable inferences

19 in BNSF's favor, could not conclude on this record that either A-Ceco or BNSF had a

20 reasonable expectation of FELA coverage.

21 **3.      A-Ceco Did Not Have a Reasonable Expectation of FElA**
    **Coverage**

22

23 The court will assume, in the absence of contrary Arizona authority, that an

24 additional insured such as BNSF may assert the doctrine of reasonable expectations on

    behalf of the named insured.  *See McIntosh v. Scottsdale Ins. Co.*, 992 F.2d 251 (10th Cir.

25 1993) (reasonable expectations of additional insured relevant to construction of insurance

26 policy under Kansas law).  In *Gordinier*, the Arizona Supreme Court identified four

27

28

1    factual scenarios in which a reasonable expectation of coverage may defeat an

2    unambiguous boilerplate insurance term.  Each scenario is considered below.

3                    **i.      The FELA Exclusion Is Easily Understood**

4            First, a reasonable expectation of coverage may attach "[w]here the contract terms,

5    although not ambiguous to the court, cannot be understood by the reasonably intelligent

6    consumer who might check on his or her rights."  *Gordinier*, 154 Ariz. at 272-73, 742

7    P.2d at 283-84.  A-Ceco did not have a reasonable expectation of FELA coverage under

8    this factor as a matter of law because the exclusion was plainly worded and could be

9    easily understood by a reasonable insured of A-Ceco sophistication.  *Reliance*, 121 F.3d

10   at 904 (Although the sophistication of the insured is not outcome-determinative, the

11   "insured's status [is] a factor to be considered when resolving whether the insured acted

12   reasonably in expecting a given claim to be covered.  As such, courts should carefully

13   consider whether an insured of the specified level of sophistication had reason to know of

14   the existence of the exclusion prior to purchasing or renewing the policy, and hence had

15   effective control over the insurance transaction.")  The Policy states that Coverage A

16   "does not apply to . . . . [a]ny obligation of the insured under [the] Federal Employers[']

17   Liability Act."  (BSOF Ex. 4 § I(2)(d), Endorsement No. 14.)  That the exclusion is found

18   in an endorsement rather than in the Policy itself is of no moment.  2 *Couch* § 18:17 (The

19   policy and the endorsement together constitute the contract of insurance and "are to be

20   read together to determine the contract actually intended by the parties.").

21                   **ii.     There Was Full and Adequate Notice**

22           *Gordinier*'s second factor applies "[w]here the insured did not receive full and

23   adequate notice of the term in question, and the provision is either unusual or unexpected,

24   or one that emasculates apparent coverage."  154 Ariz. at 272-73, 742 P.2d at 283-84.

25   This factor presents a closer question on the facts of this case.  The record shows that the

26   2003-2004 Zurich Policy was actually a renewal of a prior CGL policy underwritten by

27   Zurich.  (ZSOF Attach. A (application for renewal of A-Ceco's 2002-2003 CGL policy

28   sent to Trudy Hepfner, Zurich's regional manager).)  Ms. Hepfner negotiated the terms of

1    the renewal of A-Ceco's CGL Policy, including the FELA exclusion, with Swett &

2    Crawford, a registered broker paid by Zurich on a commission basis.  (Doc. # 147 Ex. 2 at

3    49-53; ZSOF Ex. 1 (Declaration of Trudy Hepfner ), Attach E, F (discussing FELA

4    exclusion).)  Swett & Crawford, in turn, dealt with Bowermaster & Associates, the retail

5    broker that discussed the terms of the Policy with A-Ceco.  (Doc. # 147 Ex. 2 at 57.)   Ms.

6    Hepfner never spoke directly with any A-Ceco employees about the CGL Policy in

7    general or the FELA exclusion in particular.  (*Id.* Ex. 2 at 50, 76.)  The written evidence

8    of the negotiations between Zurich and Swett & Crawford over the FELA exclusion sheds

9    no light upon whether that exclusion was included in the 2002-2003 policy, or whether it

10   was instead added by Zurich to the 2003-2004 Policy at issue here.[4]  (ZSOF Ex. E, F.)

11   The circumstantial evidence is consistent with either predicate fact.

12           If the prior policy covered FELA claims, and if Zurich did not in fact inform A-

13   Ceco that the new Policy excluded such coverage, then the FELA exclusion contained in

14   Endorsement 14 of the 2003-2004 Policy would be ineffective as a matter of law.  This is

15   because an insured has a right to rely on the assumption that, absent sufficient notice to

16   the contrary, the renewal was the same in terms of coverage as the original.  *Lumbermen's*

17   *Ins. Co. v. Heiner*, 74 Ariz. 152, 156, 245 P.2d 415, 418 (1952); 2 *Couch* § 29:40 (citing

18   cases). As explained by one commentator:

19           From the fact that renewal of a policy calls for an extension of the identical policy,
         it follows that the insured is not bound by a new provision added to the renewal
20       policy where he and she had not agreed to its inclusion. . . . [T]he terms of the old
         policy are effective unless contrary intent is clearly demonstrated or the insurer
21       makes the insured aware of the changes in the new policy, and the addition of new
         terms to a renewal policy may support the insured's action for reformation of the
22       new policy to conform to the original terms.

23

24   ───────────────

25           [4] The Railroad challenges the admissibility of Zurich's Exhibits E and F on hearsay
     and lack-of-foundation grounds.  (Doc. # 91 at 13-14.)  BNSF's objections are immaterial
26   because the court refers to this evidence not for the purpose of proving that A-Ceco accepted
     the FELA exclusion in the 2003-2004 Policy, but rather to show that the FELA exclusion
27   was discussed by Swett & Crawford and Zurich at the time of the renewal of the 2002-2003
     policy.
28

> The law does not impose upon the insured under a renewal policy the duty to inspect such renewal policy, and failure of the insured to examine his or her new policy when it was delivered to him or her, which would have led him or her to discover an added clause, does not defeat recovery under the terms of the original policy where the insurer did not inform him or her that the renewal policy would in any way be different from the original.

2 *Couch* § 29:42 (citing cases).

The 2002-2003 Zurich policy is not in evidence, however.  The Railroad noted as much in its March 14th 2007 Response brief.  (Doc. # 91 at 12, 12 n.5 ("Moreover, [Zurich] has yet to produce a complete and accurate copy of the 2002-03 policy . . . let alone to offer deposition testimony about the negotiations or contents of the policy.")  Counsel for BNSF appended a Rule 56(f) Declaration to its Response, seeking additional time to pursue discovery regarding "A-Ceco's knowledge and understanding" of Zurich's CGL policies.  (*Id*. Ex. A.)  The court granted several requests for an enlargement of time to pursue discovery in this case.  (Doc. ## 89, 120 at 2, 121, 144.)  On August 6, 2007, three days prior to oral argument, BNSF filed a "Supplemental Statement of Controverting Evidence" in which it blamed Zurich for failing to "make [the 2002-2003 policy and other] vital evidence available."  (Doc. # 146 at 2 n.1.)  Zurich maintains, however, that although BNSF "may have indicated its interest" in the 2002-2003 policy in its papers and during a recent deposition, Zurich has "not received any written requests for this information as of this date."  (Doc. # 153 at 6.)

Absent a timely request not responded to, Rule 56(f) sets the standards for lack of evidence on a motion for summary judgment.  The Railroad's March 14, 2007 Rule 56(f) affidavit does not entitle it to relief because BNSF had ample opportunities after filing that document to formally request the 2002-2003 policy.  In these circumstances, the Railroad is not entitled to a favorable evidentiary inference.[5]  (*Cf.* doc. # 91 at 13 n.5.)

---

[5]If the briefing is incomplete or otherwise inaccurate and BNSF did make a timely request for the 2002-2003 Zurich policy, the court will entertain motion for reconsideration on the effect of the prior policy upon the reasonableness of A-Ceco's expectation of FELA coverage.

1    On a properly supported Rule 56 motion, the burden redounds upon the party

2    opposing summery judgment to identify or produce evidence sufficient to generate a

3    triable issue of disputed fact.  BNSF has failed to carry its Rule 56 burden.  Therefore, in

4    the absence of a genuine evidentiary dispute, the court finds that the 2002-2003 prior

5    policy was the same as the current policy, as Zurich contends that it is.  (Doc. # 147 Ex. 2

6    at 43-44, 56-57, 65 (Ms. Hepfner testified that Zurich has excluded coverage for FELA

7    liabilities in all "contractor policies" since 2001, and that the 2002-2003 policy was

8    substantively identical to the 2003-2004 Policy, the only difference being a change in the

9    premiums); ZSOF Ex. 1 at 3 (Zurich's policy on FELA exclusions for railroad

10   contractors).)[6]

11   A-Ceco had a duty to read the 2002-2003 policy, and absent some evidence of

12   non-delivery or lack of possession, A-Ceco is bound by the terms of the policy that it

13   received and had an opportunity to read.  2 *Couch* § 27:74.  Mr. Russell testified that he

14   believed that Zurich has always extended coverage to FELA claims.  (Doc. # 147 Ex. 1 at

15   9, 10.)  But he did not read the Policy.  Instead, Mr. Russell delegated all insurance-

16   related tasks to  David Partee, A-Ceco's senior vice president for corporate management.

17   (Doc. # 153 Ex. 1 at 83.).  Mr. Partee did not read the Policy, either.  Zurich never told A-

18   Ceco that its CGL coverage extended to FELA claims.  If either A-Ceco employee had

19   read the 2002-2003 policy, they would have seen that Endorsement 14 denied coverage

20

21 _____

22   [6]The Railroad challenges Ms. Hepfner's Declaration on the ground that she lacks
foundation to attest to Zurich's company policy on FELA exclusions in railroad contractor
23   CGL policies.  (BSOF at 3-4.)  However, the portions of the Hepfner deposition identified
by BNSF cure the Railroad's evidentiary objection.  Ms. Hepfner stated that she has worked
24   for Zurich as a regional manager in Zurich's Rail Division Office since February 2001.
(Doc. # 147 Ex. 2 at 14.)  In this position, Ms. Hepfner issues "commercial general liability
25   [policies] for [railroad contractors'] third-party liability."  (*Id*. Ex. 2 at 14-17.)  Ms. Hepfner
declared, "The endorsements that are put on a contractor's commercial general liability are
26   standard within the department.  They're put on all contractor policies . . . [s]ince I started
with the company. . . .  We don't provide worker's compensation, disability benefits or
27
28   FELA for a railroad contractor."  (*Id*. Ex. 2 at 42-45.)

for FELA claims in plain and unambiguous terms.  (Doc. # 147 Ex. 2 at 50.)  There can be no reasonable expectation of FELA coverage on the part of A-Ceco here.

### iii.    No "Objective Impression" or "Reasonable Belief" of FELA Coverage

The third and fourth situations to which the reasonable expectations doctrine applies under *Gordinier* require "some activity which can be reasonably attributed to the insurer."  154 Ariz. at 272-73, 742 P.2d at 383-84.  The Railroad contends that the testimony of Kevin Duffy, the Zurich claims representative, provides such evidence.  (Doc. # 146 at 6.)   BNSF is mistaken.  Mr. Duffy testified, without factual elaboration or additional detail, that Zurich paid a claim brought by A-Ceco on behalf of a BNSF employee on a prior occasion.  According to Mr. Duffy, who remembered very little about the claim, BNSF employee Eddie Lucero was injured in California by a backhoe with "A-Ceco doing some work in the area."  (Doc. # 147 Ex. 4 at 36-37.)  Mr. Duffy could not say whether A-Ceco was responsible for the accident, or whether Mr. Lucero had brought suit against the Railroad or A-Ceco, or both.  There is no evidence as to whether Mr. Lucero's suit sounded in FELA or in the common law of torts.  Mr. Duffy also could not say whether Zurich paid this claim under the 2002-2003 policy, or under the 2003-2004 Policy.  (*Id.* Ex. 4 at 37.)

BNSF suggests, solely on the basis of the testimony of Mr. Duffy, that Zurich actually paid a FELA claim asserted by a BNSF employee against the Railroad under the indemnification clause of the Work Agreement.  (Doc. # 146 at 6.)  But this is pure speculation, and in the precincts patrolled by Rule 56, "Proof based on arrant speculation, optimistic surmise or farfetched inference will not suffice."  *Kelly v. United States*, 924 F.2d 355, 357-58 (1st Cir. 1991).  It is equally likely, for example, that Mr. Lucero filed suit directly against A-Ceco on a common law theory of tort theory, making the FELA exclusion irrelevant.  The fact that Zurich provided Coverage A on the Lucero claim is of no evidentiary value here.  Therefore, Mr. Duffy's testimony is not sufficient to create a

1  triable issue of fact regarding the reasonableness of A-Ceco's expectation of FELA

2  coverage.

3       Next, the Railroad focuses the court's attention upon the wording of Endorsement

4  Two in the 2003-2004 Policy, which modified the standard definition of the term "insured

5  contract" so as to "afford coverage for the named insured [A-Ceco] in connection with

6  construction or demolition operations, on or within 50 feet of railroad tracks or railroad

7  property." (*Id*. Ex. 4.)  The Railroad contends that, "because the insurance policy provides

8  coverage for injuries within 50 feet of the railroad," and because "it is primarily railroad

9  employees in that area," Endorsement Two "could reasonably lead A-Ceco to believe that

10 it would have coverage for [FELA] claim[s]."  (Doc. # 146 at 4.)  This, too, is unavailing.

11      Endorsement Two expands coverage under the exception to the exclusion for

12 contractual liability so as to protect A-Ceco from indemnification claims brought by the

13 Railroad arising out of "occurrences" on or near the railroad tracks.   If a BNSF employee

14 suffers bodily injury and sues the Railroad in tort, the indemnification claim asserted

15 against A-Ceco is likely to sound in FELA.  However, Endorsement 14 is an absolute bar

16 to recovery on FELA claims, including FELA-based indemnification claims. *Nichols*,

17 175 Ariz. at 356, 857 P.2d at  408 ("A contract for insurance, like any other contract, is

18 not a collection of separate unrelated parts; each part must be read and interpreted in

19 connection with all other parts.") (citation and internal quotations omitted).

20       There is no evidence to suggest that Zurich or any of its agents misled A-Ceco

21 into believing that the insurer covered FELA liabilities.  Endorsement Two, which carries

22 out the promise of Section 18(a) of the Work Agreement, does not do so.  The fact that

23 FELA-based indemnification claims are *possible* under Endorsement Two is not

24 sufficient to defeat the plain language of Endorsement 14.   For it is not objectively

25 reasonable for an insured such as A-Ceco to infer coverage from one endorsement when

26 such coverage is expressly denied by another of equal prominence.  The FELA exclusion

27 is not buried in some out-of-the-way part of the policy.  There is nothing arcane or

28 technical about its language.  Having taken the time to read about the 50-foot coverage

expansion contained in Endorsement Two, A-Ceco should have gone on to read the bad news contained in the FELA endorsement just a few pages later.  *Darner* and its progeny apply "to a limited number of cases in which the boilerplate contract clauses are unambiguous but still operate oppressively."  *Phila*. *Indem*., 200 Ariz. at 17, 21 P.3d at 403.  There is no evidentiary basis for a claim of "reasonable expectations" here.

### 4.    BNSF Did Not Have a Reasonable Expectation of FELA Coverage

The Railroad contends that it, too, was justifiably ignorant of the FELA exclusion. (Doc. # 146 at 5-6.)  BNSF grounds this argument upon the Certificate of Insurance sent by Bowermaster & Associates upon A-Ceco's renewal of the Zurich policy in September 2003.  (BSOF Ex. 5.)  "The Certificate of Insurance provided to BNSF listed BNSF as an additional insured but contained no mention that FELA claims were excluded from coverage," the Railroad observes.  (Doc. # 91 at 12.)  This is contrary to BNSF's "reasonable expectations" because the Railroad  "specifically negotiated with A-Ceco for coverage of FELA claims," "expected that it would be covered by the Policy for FELA claims," and was "induced to believe that the coverage required by the [Work] Agreement was provided by the Policy."  (*Id*.)  These arguments lacks merit.

The Certificate of Liability upon which BNSF so heavily relies contains the following bold-faced disclaimer:  "This certificate is issued as a matter of information only and confers no rights upon the certificate holder.  This certificate does not amend, extend or alter the coverage afforded by the policies below."  (BSOF Ex. 5.)  The "Coverages" section provides an even more explicit warning: "Notwithstanding any requirement, term or condition of any contract or other document with respect to which this Certificate may be issued or may pertain, the insurance afforded by the policies described herein *is subject to* all the terms, *exclusions* and conditions of such policies." (*Id*. Ex. 5 (emphasis added).)  BNSF relied at its peril upon the summary of coverage provided by Bowermaster & Associates.  Yet, in spite of these conspicuous admonitions,

1  BNSF did not even attempt to verify that FELA coverage existed.  This is alone sufficient

2  to defeat the Railroad's *Darner* claim.

3          In Arizona, the presentation of a certificate of insurance does not alone create

4  coverage obligations or legal obligations between the insurer and the certificate holder.

5  *Cont'l Cas. Co. v. Signal Ins. Co.*, 119 Ariz. 234, 238, 580 P.2d 372, 376 (Ct. App. 1978)

6  ("[A] Certificate of Insurance cannot contradict the terms of a policy; it only provides

7  information as to the policy's contents."); *SLA Prop. Mgmt. v. Angelina Cas. Co.*, 856

8  F.2d 69, 73 (8th Cir. 1988) ("The law governing this issue is clear.  The certificate is not a

9  part of the contract of, or necessary to, the insurance.  It served merely as evidence of the

10  insurance.") (citation and internal quotations omitted).  *TIG Ins. Co. v. Sedgwick James of

11  Wash.*, 184 F. Supp. 2d 591, 597 (S.D. Tex. 2001), is to the same effect.  "[W]hen a

12  certificate of insurance contains language stating that the certificate does not amend,

13  extend, or alter the terms of any insurance policy mentioned in the certificate, the terms of

14  the certificate are subordinate to the terms of the insurance policy.  The certificate of

15  insurance will not suffice to create insurance coverage if *such coverage is precluded* by

16  the terms of the policy." (Emphasis added.)

17          The Railroad notes that there is no evidence that Bowermaster & Associates

18  attached the 2003-2004 Policy to the Certificate of Insurance.  (Doc. # 91 at 11.)  But this

19  irrelevant because BNSF, like A-Ceco, had a duty to read the pertinent language in the

20  2002-2003 policy, which the 2003-2004 Policy merely renewed.  Had BNSF taken the

21  reasonable step of obtaining a copy of the 2002-2003 Policy, the Railroad would have

22  learned that, contrary to its unsubstantiated subjective belief, there was no FELA

23  coverage at all.  There is no evidence on this record that might excuse the Railroad's

24  failure to verify that FELA coverage existed.

25          The Railroad rejoins that its expectation of FELA coverage was reasonable, in

26  spite of the disclaimers, because the Certificate of Insurance confirmed that the terms of

27  the "Insurance" section of the Work Agreement with A-Ceco had been honored.  (BSOF

28  Ex. 1 § 18(a).)  For example, the second page of the Certificate names BNSF as an

1   "additional insured . . . as per the attached A.I. form," and states somewhat cryptically

2   that the "50 feet coverage endorsement applies to liability as per the attached."  (BSOF

3   Ex. 5 at 2.)  The problem with this argument is that A-Ceco did not agree in the

4   "Insurance" section of the Work Agreement to procure FELA coverage.  A-Ceco agreed

5   in Section 18(a)(2) of the Work Agreement to "provide and maintain" commercial

6   general liability insurance both for itself and for the Railroad.  The CGL policy was to

7   cover "all of the work and services to be performed" under the Work Agreement,

8   including personal injuries.  (BSOF Ex. 1 § 18(a).)  A-Ceco did not promise to *insure* the

9   Railroad's FELA claims.  Rather, A-Ceco promised in another Section of the Work

10  Agreement to *indemnify* the Railroad for those claims, as modified by the Arizona statute.

11  (*Id.* Ex. § 16.)  The absence of the FELA exclusion on the Certificate of Insurance is

12  irrelevant because the FELA obligation was not expressly linked to a promise to obtain

13  commercial general liability insurance.  There is no basis for a *Darner* claim here.  The

14  Railroad's attempt to strike the FELA exclusion from the 2003-2004 Policy must fail.

15          **D.      Bad Faith Denial, Punitive Damages**

16          Zurich's denial of BNSF's claim for FELA coverage was supported by the plain

17  language of the 2003-2004 Policy.  Therefore, Zurich's Motion for Summary Judgment

18  will also be granted as to the Railroad's claims for bad faith denial of coverage (Count

19  XI) and punitive damages (Count XII).  (Doc. # 41.)

20          IT IS THEREFORE ORDERED that Zurich North America d/b/a Steadfast

21  Insurance Company's Motion for Summary Judgment (doc. # 75) is granted.

22          DATED this 27th day of August 2007.

23

24  _____

25                          Neil V. Wake
                    United States District Judge

26

27

28